FISCHER *v.* HAYES.

*(Circuit Court, S. D. New York. January 26, 1881.)*

1. EQUITY PRACTICE—REPLICATION—RULE 66.
     A replication, filed without leave, after the expiration of the time prescribed by rule 66, may be ordered to stand, in the discretion of the court.

2. SAME—PROOF—RULE 69.
     Testimony taken more than three months after the filing of such replication, may be admitted in evidence at the hearing, in the discretion of the court.

3. EQUITY PLEADING—SUIT FOR INFRINGEMENT—BILL.
     In a suit for the infringement of a machine patent, the bill need not state what articles the defendant has manufactured by the use of the machine.

4. INFRINGEMENT—WANT OF CONSENT—PROOF.
     Want of consent need not be shown in a suit for the infringement of a machine patent, where such fact was alleged in the bill and not denied in the answer.

5. LETTERS PATENT No. 74,068, granted Valentine Fischer, February 4, 1868, for an "improvement in machine for forming sheet-metal mouldings," is *not void for want of novelty.*
     *Fischer v. Wilson,* 16 Blatchf. 220.

6. SAME—SPECIFICATION—CONSTRUCTION.
     The expression, "all kinds of smooth mouldings," contained in the specification of such patent, should be construed to mean, "all kinds of smooth right-angled mouldings;" and the expression, "all sorts of angles," should be construed to mean, "all the kinds of square or right-angled angles" which can be made by the square dies, therein described.—⌊ED.

In Equity. Suit for Infringement.

*Charles F. Blake,* for plaintiff.

*James H. Whitelegge,* for defendant.

BLATCHFORD, C. J. This suit is founded on letters patent No. 74,068, granted to the plaintiff February 4, 1868, for an "improvement in machine for forming sheet-metal mouldings." The patent was before this court in *Fischer* v. *Wilson,* 16 Blatchf. 220, and was there adjudicated upon. In that case it was held that the defendant had infringed claims 2 and 4. The novelty of claims 2 and 4 was attacked. Claim 4 is in these words: "4. Arranging the female die, G, above the male die, E or F, for the purpose of keeping the female die clear, as set forth." It was construed to be a claim to the described arrangement of the two dies, so that, having such a lower male die as E or F is, the female die shall be above the male die, and thus be kept clear, resulting in keeping both dies clear, instead of having the female die below, in a position to be clogged and mar the work, even though the upper male die should clear itself; and it was held that the lower male die must be so made and arranged as to afford no chance for the collection of dirt that would destroy the perfection of the work. Even though the female die is placed over the male die, yet the Fischer invention is not found if the male die has concavities or surrounding hollows in which dirt or foreign matter can collect. With that view of claim 4 it was held, in the Wilson case, that nothing was shown which affected the novelty of that claim. Various patents were introduced on the question of novelty, with other evidence. One of these patents was the Worthen and Renwick patent, referred to hereafter. It was held that nothing which was shown affected the novelty of claim 2 or claim 4.

In the present case several questions are raised which were not brought up in the Wilson case:

(1) As to the objection that the replication to the answer was not filed until after the time prescribed in rule 66, and that then it was filed without prior leave of the court, and that the plaintiff's proofs were taken after the expiration of three months from the time the replication was in fact filed.

The order dated March 19, 1880, but actually filed and entered March 25, 1880, made on the defendant's motion to dismiss the bill for the foregoing reasons, disposed of the foregoing questions. It was an order within the power of the court to make, in the exercise of its discretion, under rules 66 and 69. The court could rightfully direct the replication filed and the proofs taken to stand, as if the proceedings had severally been had within the times prescribed, as fully as if the order of the court to that effect had been made before taking such proceedings. The record shows that as full opportunity was given afterwards to the defendant to enter objections on the record to the proofs previously taken, and to cross-examine the witnesses before examined, as if his counsel had been present when they were taken, and that he availed himself of such opportunity. The order, through some oversight, does not show on its face that affidavits were presented on the part of the plaintiff as a foundation for denying the defendant's motion and for granting the plaintiff. the relief granted. Such affidavits are on file among the papers in the cause, and it clearly appears that they were presented and acted on by the court. Like affidavits were presented on like motions made at the same time in the case against Neil and the case against O'Shaughnessey and Simpson, and those affidavits are recited in the orders made at the same time, of the same tenor, in those two cases.

(2) As to the objections to the direct testimony of the witnesses MacClay and Abbott. These questions are disposed of in the decision on the separate motion of the defendant to strike out such testimony.

(3) The bill charges that the defendant "has operated and used, and is still operating and using, in the city of New York, at No. 71 Eighth avenue, a machine or machines constructed in accordance with and containing and embodying" the invention secured by the patent. The objection is taken that the bill does not state what the defendant has made by the use of the machine, or that he has made cornices with it. The patent grants to the plaintiff the exclusive right to use the

improvement patented for any purpose. The improvement is stated in the specification to be an invention relating to "a new machine for pressing mouldings for cornices, etc., from galvanized or other sheet metal." What is meant by "mouldings" is shown by the red lines in figures 2 and 3 of the drawings. They are structures resulting from round or angular bends in sheet metal. The allegation of the bill is sufficient.

(4) As to the use by the defendant, the evidence of MacClay shows that since the patent was granted the defendant has used at his places of business in the city of New York, for making sky-light bars, a machine embodying the inventions covered by claims 2 and 4 of the patent, with the female die above, and reciprocating up and down, and the male die below, not re-reciprocating, and resting on an upright standard, which was bent over at the top so as to allow metal which had been partly bent to swing down under the male die, while further bends were being made, and not have the prior bends crushed out. The male die was so arranged that no dirt could collect around it, or between it and the female die. The defendant had this machine made for himself. In the Fischer machine and in the defendant's machine only two dies are in place at a time, one upper one and one lower one. Abbott says that he saw the defendant's machine used in his factory to bend sheet metal into a sky-light bar. The evidence is sufficient to show the use of the machine in infringement of claims 2 and 4, in bending square angles in sheet metal. This is enough. Moreover, the answer admits that the defendant has a machine, and uses or operates it. A drawing of it is given by the witness MacClay. It was easy for the defendant to show, if the fact were so, that this drawing was not correct, or that the machine had not been used by him in the shape shown, to make the bends testified to in sheet-metal sky-light bars.

(5) The bill alleges that the defendant's use of the machine has been without the plaintiff's consent. This allegation is not specifically denied in the answer, nor does the answer

allege any license or consent. It is objected that the plaintiff has not proved want of consent. This was not necessary. It was for the defendant to prove consent, if anything needed to be proved on the subject.

(6) The apparatuses testified to by Philip Barkel, Axel Schiermacher, and John R. Hopkins have no bearing on the plaintiff's patent. They are not alluded to in the brief for the defendant. They show no organized machine with a concave upright standard, on the top of which a male die is placed, and they show no male or female die, and the defendant's expert, Mr. Renwick, gives no testimony in regard to them.

(7) The machine testified to by Ristine and Brand was a corrugating machine, and was incapable of making the structure shown in the drawings of the plaintiff's patent. It is not shown ever to have been used in bending a square angle in sheet metal. It is not shown to have been ever used with only two dies at a time,—one above and one below,—with the lower die arranged as in the plaintiff's machine. The testimony given by Renwick and Ristine as to the machine, and the model of it, was properly objected to on the ground that the use of the machine was not set up in the answer.

(8) As to the Peltier patent, Mr. Renwick admits that a change would have to be made in the apparatus shown by figure 10, in order to do the work shown in the drawings of the plaintiff's patent. It is plain that this change is material. It is also clear that figure 8 does not show an apparatus anticipating claim 4 of the plaintiff's patent, and that figure 10 does not show an apparatus anticipating either claim 2 or claim 4 of that patent.

(9) The Byrne book, pages 186 and 187, does not show the plaintiff's invention as to either claim.

(10) The only defence on the question of novelty, pressed with any force, is the alleged prior use, in such a way as to anticipate the plaintiff's patent, of a machine made under the patent to W. E. Worthen and H. B. Renwick, before referred to. That patent was granted July 5, 1859, for an "improve-

ment in corrugating sheet metal." The specification of the patent describes the then existing mode of corrugating sheets of metal by means of properly-shaped male and female dies extending over the sheet, and between which the sheet is placed. The dies are then made to approach each other. The creeping of the metal to supply sufficient surface to conform to the curves and angles of the mould is resisted by the friction of the bent metal sliding over the faces of the dies, and by the force required to bend the metal from the shape it has already taken into the shape of the next succeeding corrugation. The power required is enormous, and the metal ceases to creep and stretches, and is injured, weakened, or torn apart. The new device was to corrugate by properly-shaped dies acting in succession on different parts of the sheet. The method is described thus in the specification: There is a lower or female die, whose cross-section is the form desired in the finished sheet metal, and it does not differ from those then in use. A set of upper dies is then procured, whose acting surfaces, when properly arranged, will constitute a single surface, conforming in shape to one side of the finished sheet. They are arranged so as to be free to move towards and away from the under die and be properly guided. In using the machine the sheet is laid loosely on the lower or bed side, and then one of the upper dies is forced down on it until the metal takes the proper shape. That die is then left down, and the next die in succession in the series is brought down and left down, and so in succession until the operation is finished. The metal can thus creep and conform to shape. It is apparent that this arrangement, as described, does not contain the plaintiff's invention, although the specification speaks of using the apparatus for corrugating mouldings for the cornices of large buildings. The claim of the patent is this: "The method of corrugating or moulding sheet metal by several dies acting in succession, substantially in the manner specified, upon a sheet resting upon a bed, die, or dies, so as to cause the metal to conform to shape, substantially in the manner herein described." The patent-

ees state, in the specification, that they "intend at times to use a sectional lower die in connection with sectional upper dies, acting in succession, as a convenient method of obtaining several distinct patterns from a comparatively small number of dies, and for other purposes." But this suggestion does not meet the invention embodied in claim 4 of the Fischer pa'ent.

Mr. Worthen testifies, however, that he made a machine for Althouse & Co. in which the upper die was stationary and the lower die moved up, the female die being sometimes above and sometimes below. He also testifies that in the machine he made for Althouse & Co., under the patent, the dies were generally in gangs, but the last right-angled bend was sometimes put in with a single set of dies, one above and one below,— the female above and the male below,—both detached from the dies which made the other bends. He also says, elsewhere, that the top die was fixed, and a lower sectional die was raised against it, and then clamped up and left, and the bed plate let down and other lower sectional dies raised in succession, and left up; that when two dies were used singly, one above and one below, the upper one was fixed and the lower one was raised up against it, the upper die being the female die and the lower die the male die, and the sheet of metal being placed on the latter. This machine, he says, was ultimately sold for old iron. He says that cornices made by the method thus described were put upon two buildings which he names. Mr. Henry B. Renwick, the other patentee, and the same person who is the expert for the defendant, says that the machine he saw at Althouse & Co.'s was built in accordance with the Worthen and Renwick patent, and that the upper die and the lower die were both in sections; that he has no distinct remembrance of ever having seen the machine operated with only one male die and one female die in it, though it was capable of being operated with one pair of dies only, and with the female die uppermost; and that, when used with several dies in it, some of the female dies were uppermost and some lowermost. Mr. Renwick does not assert that in view of the

use of female dies above male dies, as so testified to by him, in the Worthen and Renwick machine, and of what is found in the Byrne book, there was not invention in claim 4 of the Fischer patent; and he, in substance, admits that if claim 4 is limited to the use of a single upper female die above a single lower male die, the invention in claim 4 did not exist in the machine which Althouse & Co. had, unless that machine was used in the way testified to by Mr. Worthen. He also testifies that so far as he remembers the upper set of dies in that machine was the stationary set.

The statement that, in the machine referred to, the lower dies were carried up singly against the upper die, is contradicted by four workmen, Pressler, Emerson, Handmann, and Engleman, who used the machine at Althouse & Co.'s. Pressler has been in the employ of Althouse & Co. for the past 28 years, and foreman for them for the past 16 years. He says that even when the lower die was made in pieces or sections, so that a difference could be made in the height of the cornice, the lower sections were bolted together and were always elevated together, and one section of the lower die could not be used alone; that a single male die was never used under a single female die; that a sectional top die was wedged down to make the bend, and then the whole lower die was raised up against it, and then that sectional top die was fastened to the lower die, and the lower die was let down, carrying that top die, and then a second sectional upper die was operated with in the same way, and so on; and that the female die was below. Emerson, a machinist, who has been in the employ of Althouse & Co. for 22 years, and built the machine referred to under Worthen's superintendence, says that the lower die was generally in sections, and the upper dies were in sections; that the lower sectional dies could not be moved up singly, but were bolted together; that the lower die was moved up; that one at a time, and sometimes two at a time, of the upper sectional dies were dropped down, to bend with; that he never knew of a single female die used above a single male die on the machine, to make the last right-angled bend,

but such bend was made with a mallet; that he does not recollect the use of a single lower male die without any other form of bend or angle on the face of the lower die; and that when a single upper sectional die had been let down and used to bend, it was clamped to the lower die, and another sectional upper die was then used. Handmann, a house-smith, worked for Althouse & Co. for 13 years, and while they had this machine, which he assisted in making. He says the upper dies were sectional, and were used in succession, by letting one down at a time, and bending with it, by bringing up the lower die against it, and then th⁻ upper die was clamped to the lower die and went down with it; and that a single male die was never used under a single female die. Engleman, a house-smith, has worked for Althouse & Co. for the past 21 years. He worked on this machine. He says he never saw used in it a single male die under a single female die, there being nothing by the side of the male die. The testimony of Bohne and Sellman goes, also, to contradict Worthen as to the way in which the last right-angled bend was made in the specific cornices referred to by Worthen.

It must be held that the defence sought to be established by the testimony of Mr. Worthen is not made out. •

(11) Objection is made to the specification of the plaintiff's patent because it states "that but two kinds of dies for all kinds of smooth mouldings that may have to be formed are needed, viz., rounded and square dies," and that "of the latter but one set is required for making all sorts of angles." No such defence is set up in the answer; but the specification is not open to the objection made. Of course, a square or right-angled die will not make a bend of a different angle. There is nothing in the specification to indicate that the patentee contemplated making any angular bend other than a right-angled bend. The drawings show no other. But they do show right-angled bends in contrary directions on the same moulding. The expression, "all kinds of smooth mouldings," means, in respect to angular mouldings, "all kinds of smooth right-angled mouldings," and the expression, "all sorts

of angles," means "all the kinds of square or right-angled angles" which can be made by the square dies, and which are shown in figures 2 and 3; the mouldings shown in those two figures in red lines being the mouldings which the specification states the machine is to form. The only angles in the mouldings in those two figures are right angles.

(12) It is not apparent for what purpose the testimony of Kittredge was introduced. No defence to which it can relate is set up in the answer. It is not referred to in the brief of the counsel for the defendant. No defence of laches or license, or acquiescence by the plaintiff in the use of the machine by the defendant, is set forth in the answer. The plaintiff's patent was granted in February, 1868. He began his suit against Wilson in May, 1869. It was not decided until April, 1879. The defendant's machine was made in 1872. This suit was brought in May, 1879.

(13) The inventions covered by claims 2 and 4 of the plaintiff's patent were new, useful, and patentable.

All the questions raised and discussed on the part of the defendant have been carefully considered, and such of them as have not been particularly adverted to in this decision have not been overlooked; but they are of such minor importance that they can have no weight to control or modify the views before expressed, and therefore it is not deemed necessary to comment upon them.

There must be a decree for the plaintiffs as to claims 2 and 4.