CONSOLIDATED STEEL & WIRE CO. v. MURRAY et al.

(Circuit Court, N. D. Ohio, E. D. May 8, 1897.)

No. 5,638.

INJUNCTION—INTIMIDATION OF WORKMEN BY LABOR UNIONS.

An injunction will be granted where members of labor organizations conspire unlawfully to interfere with the management of the business of a corporation, and to compel the adoption of a particular scale of wages, by congregating riotously and in large numbers, at and near the works of the corporation, for the purpose of preventing persons not members of said organizations from entering the employ of the corporation or remaining therein, by intimidation, consisting in physical force, or injury, actual or threatened, to person or property. The jurisdiction of equity is not ousted because the acts complained of may also be the subject of indictment.

This was a suit in equity by the Consolidated Steel & Wire Company against Patrick Murray, Daniel Murray, Patrick Ryan, and others, and the P. J. Mundie Lodge, No. 1, and Banner Lodge, No. 2, of the Rod-Mill Workers of America, etc., to enjoin them from interfering with complainant and its employés.

Squire, Sanders & Dempsey, for complainant.
Meyer & Mooney, for defendants.

SAGE, District Judge. The complainant is a corporation organized under the laws of the state of Illinois, with its principal place of business in the city of Chicago. It is engaged in the state of Illinois, in the city of Cleveland, Ohio, and elsewhere, in the manufacture of steel wire and wire nails. In the city of Cleveland it owns and operates a large plant and mill, having about a half million dollars invested in its business, and employing, when running up to full capacity, about 500 men as operatives. Prior to April, 1896, it had contracted with a full complement of men for the operation of its mill and plant, and, it is set forth in the bill, had made a satisfactory agreement with each of said men as to the price of his labor for the period of one year. Complainant's contracts were sufficient to continue its mill and plant in full operation for that period. The bill sets forth that for several weeks prior to April, 1896, the defendants, including P. J. Mundie Lodge, No. 1, and Banner Lodge, No. 2, of the Rod-Mill Workers of America,—voluntary organizations,—through

their officers, agents, members, and employés, notified complainant and its employés that complainant was not paying wages to its employés in accordance with the so-called "Cleveland Scale," and undertook to compel said employés to become members of said lodges, or one of them, and to enforce the payment of wages by complainant in accordance with the "Cleveland Scale"; that the complainant refused to recognize the right of said defendant lodges, or their members, officers, agents, or employés, to interfere with it in the management of its said business, and the employés of complainant refused to become members of said lodges, or either of them; that thereupon the said lodges, through their officers, members, agents, or employés, declared a strike in the mill and plant of complainant, and attempted to, and did, by force and violence, restrain many of complainant's employés from entering the complainant's works and engaging in the duties which they had contracted to perform; and that in many cases said employés were by the defendants assaulted and beaten, and by force and violence prevented from approaching or entering upon the complainant's premises.

By reason of the acts aforesaid, and of continuous, uninterrupted attempts of defendants to compel complainant to recognize the said lodges or unions, and the scale of prices dictated by said lodges or unions, and to coerce its employés to become members of said lodges, or one of them, complainant, in the month of April, 1896, determined to, and did, close indefinitely its mill and works in the city of Cleveland, and they remained closed until about the 1st day of March, 1897, when they were opened, and complainant offered employment to such laborers as might be acceptable to it for the positions which it had at its disposal. Thereupon the defendant lodges, acting through their officers, agents, members, and employés, began to attempt to coerce the laborers and employés engaged in the operation of said mill and works to become members of said lodges, or one of them, and to force complainant to pay wages according to the "Cleveland Scale," arbitrarily fixed by said lodges, and other lodges, of said Rod-Mill Workers of America, and they have continuously since that time, without interruption, persisted in attempting to so coerce and force complainant and its laborers and employés.

It is further averred in the bill that no contract rights existed between the complainant and said lodges, their officers, agents, members, or employés; that complainant at all times refused to recognize in any manner whatsoever said lodges, their officers, agents, members, or employés, none of whom are now employés of complainant, nor have they been in complainant's employment, "at least since the month of April, 1896."

It is further averred that the defendants and others daily congregate in large numbers, in and about complainant's works, in their attempt to coerce complainant's employés to become members of said lodges or one of them; that in numerous instances complainant's employés have been attacked by defendants and brutally beaten; that, by threats and otherwise, defendants and others have endeavored to compel said employés to desist from performing their contracts with complainant, and to refuse to work for complainant; that defend-

ants and others persisted in following complainant's employés on their way home, and in intercepting them in lonely places, beating and maltreating them, greatly endangering life and limb, and depriving them of the freedom guarantied to them by the constitutions of the United States and of the state of Ohio; that defendants have been engaged and are engaging in said acts solely for the purpose of compelling complainant to recognize said organizations or lodges, and to submit itself to their dictation in the matter of the payment of wages, and also in the matter of hiring and discharging employés. The bill then proceeds to allege a conspiracy on the part of defendants for the unlawful purpose of preventing complainant from operating its mill and works in the city of Cleveland, excepting by the employment of persons members of said lodges, or other lodges, of said Rod-Mill Workers of America, and by the dismissal of its present force of employés, who are willing and anxious to work for complainant, and that in furtherance of said conspiracy the defendants, with others, are and have been congregating each morning and evening, at and near the mill and works of complainant and in the streets leading thereto, and in large numbers, for the avowed purpose of inducing complainant's employés to leave its employment, threatening personal violence if they refused, and that in furtherance of said conspiracy they continuously maltreated, attacked, and injured complainant's employés; that the police powers of the city of Cleveland have been invoked, and, although a detail of policemen was in constant attendance for three days prior to the filing of the bill in and about said works, it was unable to restrain or prevent said violent and unlawful acts.

Complainant further avers that at the time of the filing of the bill it had at work in its mill and works about 275 sober, industrious men, who were satisfied with the wages they were receiving, and willing and anxious to continue in complainant's employment; that defendants have threatened and were threatening to blow up and destroy, by the use of dynamite and other dangerous agencies, complainant's mill and works, and that by reason of the aforesaid violent and unlawful acts and threats it is unable properly to operate its mill and works; that the lives and limbs of persons in its employ were constantly threatened and in danger, as was its property; that the said authorities were unable to protect said employés and said property from the damage and injury constantly done and threatened by defendants.

The bill further sets forth that the complainant and its employés are entitled, under the constitutions and laws of the United States and of the state of Ohio, to the free and unrestricted exercise of their personal rights; that is to say, to the right of complainant to employ such persons as it may see fit in connection with its said mill and plant, and the right of its employés to work and labor for complainant if they so desire, without the let, hindrance, or disturbance of any person, persons, or associations whatsoever. The bill further sets forth that said employés desire to continue in its employ, and are in need of the wages stipulated for their labor for the support of themselves and their families, and that there are large numbers of

other men who are out of employment, and are seeking employment from complainant, and who are in need of the wages they would earn thereby, which complainant is ready and willing to pay, provided said men can be protected from the violent and unlawful acts of the defendants.

The bill further sets forth that the complainant has outstanding large contracts for its products to various persons and companies, which it will be prevented from fulfilling if defendants be permitted to continue so as aforesaid to unlawfully interfere with complainant's business, and that, unless complainant is permitted to operate its works in accordance with law, damages accruing by reason of complainant's inability to fulfill said contracts will be very large, and cause great loss to complainant; that the defendants, and each of them, are financially irresponsible and insolvent, and the complainant is without adequate remedy at law against any and all of them for any damages it may suffer by reason of their unlawful actions as aforesaid. The bill concludes with a prayer for an injunction and for other proper relief.

Upon complainant's application, on the 9th of April, a preliminary restraining order was issued in accordance with the prayer of the bill, to continue in force until the hearing and disposition of complainant's motion for a temporary injunction, which was set for hearing on the 22d of April. For the complainant 38 affidavits are filed, and for the defendants 47 affidavits. The affidavits for the complainant fully support the averments of the bill, and the circumstances of many cases of assault and maltreatment are detailed with the names of the defendants concerned therein. On account of their number and length it will be impracticable to refer specially to each affidavit, either of those for the complainant or of those for the defendants. Each individual defendant makes affidavit denying any acts of intimidation or violence attributed to him, and enters upon a general denial which is substantially the same in all the affidavits. It is that at no time during the periods mentioned in the bill did he congregate, with others, at or near the entrance to the complainant's works, for the purpose of intimidating or threatening or using violence or force upon any of its employés, agents, or servants, and that at no time has he hindered or delayed the complainant, or its agents, servants, or employés, in the operation of its mill or the conduct of its business, or entered upon its premises for any purpose whatever, or molested or interfered with any of its property, or with its employés or machinery, or solicited or endeavored to coerce any of the employés of the complainant to join the Rod-Mill Workers' Association of America, or any of its lodges, or in any manner interfered with or molested any person or persons employed by the complainant in the operation of its mill and plant, or while engaged in the discharge of duties in connection with said employment, either while they were upon the premises of the complainant or at any other place; that he has not induced other persons to do any unlawful act or thing against the complainant company, or its employés or its property; that he is not upon any strike, but that he is an employé of the American Wire Company (or of some one-

of the other wire companies of the city of Cleveland, as the fact may be), and engaged in the performance of his duties as such. That any threat was made by him to blow up complainant's works with dynamite or other explosive; or that he has entered into any conspiracy or combination for that purpose; or that he has carried any revolver or deadly weapon, in or about complainant's works, for the purpose of intimidating or injuring employés, or for any other purpose; or that he has threatened them, or attempted to coerce complainant to pay the Cleveland scale, or any other scale, of wages to its employés; or that the police power of the city has been invoked, and been found ineffectual to restrain violence to complainant's property, or to its employés,—is denied by each individual defendant, and like denials on behalf of the defendant lodges are made by their officers and agents. On the contrary, it is averred that at no time have more than four or five policemen been present at or near the complainant's works, and that the usual detail was one or two; that no occasion existed for invoking the powers of the city of Cleveland, the county of Cuyahoga, or the state of Ohio to keep the peace, and prevent trespassing, violence, molestation, or injury to property or person. Three policemen of the city—Paul Weis, Jeffrey Gibbons, and John J. Connell—make affidavits that they were on duty at and near complainant's works and plant at dates beginning March 24, 1897, and reaching to April 20, 1897, and that they never saw any disorder or disturbance of any kind, that the defendants whom they saw around and near the works were orderly and peaceable, that no acts of violence occurred, no additional force of policemen was required, and none was present, excepting on one occasion, when there were five extra policemen there. Why they were present is not explained. There are two Gibbonses and there is one Connell in the list of defendants. Whether they are relatives of the policemen of the same name, who are affiants, does not appear. It is enough to say of these affidavits that they are so overwhelmingly contradicted as to be utterly discredited. If the affiants are not forsworn, they are, to put the matter in the most charitable light, gifted with such facility for appealing from their knowledge to their ignorance as to be altogether unworthy of belief.

On the other hand, more than a score of affidavits, by complainant's employés and others, including persons entirely disinterested, recite acts of intimidation and violence by the defendants, and by others of a mob, assembled morning and evening and day after day, at and about the entrance to complainant's mill, preventing employés from going to their work, assaulting, beating, wounding, and maltreating them, and as they came out from the mill following them, and falling upon them, and making unprovoked, brutal, and outrageous attacks upon them, so that they went bruised and bloody to their homes, where many of them remained, fearing to attempt to go again to their work.

The affidavit of John T. Kane, grand president of the National Association of Rod-Mill Workers of America, and for six years last past an employé in the rod-mill department of the American Wire

Company in the city of Cleveland, denies all charges of the com mission of violent and illegal acts by him. Admitting that he has on several occasions requested employés of the complainant com pany not to work for that company until it should pay a reasonable rate of wages in its rod-mill department, so as not to prejudice the interests of employés of the other mills in the city of Cleveland in like departments, he affirms that he has at all times conducted him self peaceably and quietly towards the complainant's officers, agents, and employés, and has used his influence to cause others to act in like manner. He denies that he has ever requested or sought to induce complainant's employés to join the association of which he is president, or to organize a lodge thereof, and avers that it is a matter of absolute indifference to him whether said employés are so organized or not, so long as they are receiving a rate of wages equal to that received by himself and his co-employés. He denies that the complainant has suffered any injury to its property or busi ness at the hands of the defendants in this cause, and avers that, if any such injury has come to complainant, it has been caused by its own acts in attempting to secure men to do its work at less than a reasonable rate of wages, and less than is usually paid in the city of Cleveland, and in attempting to force down the wages of its em ployés to a point below what is reasonable and fair for the services rendered. He denies that the prices fixed by the complainant com pany in April, 1896, were satisfactory to the men in its employ, avers that several of its employés quit its employment for the reason that the prices were not satisfactory, and that they asked the association of which he is president to assist them in obtaining a fair rate of wages, and, as to the men who remained in the employ of the com plainant company at the rate fixed by it, they did so because they were compelled by their necessities.

He denies that the association declared a strike in the complain ant's mill, or that he or his fellow members sought to coerce the complainant to adopt the "Cleveland Scale," but admits that he and his co-defendants have sought by all lawful means to prevent the de pression by complainant company of wages in its mills below those ordinarily and usually paid in other mills in Cleveland for similar services. He admits that they have sought to induce the employés of complainant to exercise their right to abandon complainant's serv ice. He denies that said employés were under any time contracts, and declares that his efforts were limited to pointing out to them what they were doing to both employer and employé by continuing in the service of complainant at less than a fair rate of wages.

He further affirms that the complainant company, through its su perintendent, held repeated conferences with affiant and other mem bers of said association on the subject of the differences between complainant company and the defendants,—twice at the superintend ent's own house, twice at the office of the complainant company, and once at the Forest City Hotel, in the city of Cleveland,—and that said negotiations were always conducted in a friendly and cordial spirit, and that, by mutal concessions by the defendants and by the complainant's superintendent, "the differences between said company

and defendants had reached a settlement, except to receive formal ratification by the lodges of said defendants, and would have been so settled in an amicable and friendly manner, and without the intervention and extraordinary process of this honorable court, but for the hasty and ill-considered action of the president of complainant company in ordering the commencement of these proceedings."

He further denies that the defendant lodges and the other defendants, or that he himself and the other defendants, have congregated morning and evening at the works of the complainant, or in the streets leading thereto, and declares that, except three or four of the defendants, all are engaged at other mills in the performance of their regular work, "and that three or four men have been placed at intervals in the public streets leading to said works for the purpose of seeing that order was preserved, and to observe who entered and left the works of said complainant."

The statement in this affidavit that friendly and cordial negotiations between the defendants and the complainant's superintendent had reached a settlement, needing only formal ratification by the defendant lodges, and that they would have been so settled but for the institution of this suit, is remarkable. Why this complainant company, if it desired settlement as represented, should, just when it had been fully agreed to on both sides and was on the eve of final consummation, break it off, and resort to proceedings in court which must inevitably put an end to all negotiations, is to the court so entirely inexplicable as to be simply incredible. In the affidavit of defendant Patrick Murray he states that he "has been present on several occasions in the public highway leading to said company's works, under instructions of the supreme officers of the Rod-Mill Workers' Association, to do all in his power to preserve order, and to prevent any act of violence, or any threats or intimidation of the employés of said company while said employés were going into or coming out of the works of said company; that his duties on those occasions consisted in observing who went in and came out of the works of said company, and take a report thereon to the supreme officers of said Rod-Mill Workers' Association, and also, in as far as he could, prevent any interference with said employés while going to or returning from their work in said company's works."

The averments of these last two affidavits,—taken in connection with the fact that in none of the defendants' affidavits (excepting the affidavits of the policemen, to which reference has already been made) is there any denial of the specific averments of the bill, or of the affidavits filed for complainant, that there was continuously a riotous assemblage, which, through one or more of the persons composing it, threatened, intimidated, abused, and maltreated complainant's employés, at times preventing their going to their work, at other times turning them back bruised and bleeding to make their way to their homes,—are tantamount to an admission of the averments of the bill, notwithstanding the denials of the defendants that they participated in the unlawful acts of the rioters. In no other view can it be understood why the affiant Murray was sent, under instructions of the supreme officers of the Rod-Mill Workers' As-

sociation, to do all in his power "to preserve order, and to prevent any act of violence, or any threats or intimidation of the employés of said company while said employés were going into or coming our of the works of said company." The statement which follows, that his duty on those occasions was to observe "who went in and came out of the works of said company, and take a report thereon to the supreme officers of said Rod-Mill Workers' Association, and also so far as possible to prevent any interference with employés while going to or returning from their work for complainant," amounts to an admission that the association was keeping complainant's mill and its employés under close surveillance.

These averments, taken together, make it clear, not only that there was continuously a riotous assemblage known to the association, but that for some reason it was the object of the association to keep up at least the semblance of preservation of law and order, while, for some purpose, not disclosed, its object was also to have a complete list of all who went into or came out from the complainant's mill.

When we consider these last two affidavits, in connection with the fact, about which there is no question, that upon the issuing of the temporary restraining order herein, the causes of complaint mentioned in the bill at once ceased, that everything at and about plaintiff's mills has from that time until now been quiet, and the complainant's employés have been unmolested and undisturbed, the conclusion is irresistible that the defendants were in close relations with the mob, and were in fact the ruling and controlling spirits, without whom there never would have been any disturbance whatever.

Counsel for the defendants, upon the argument of the motion, assured the court that the defendants were well-disposed, orderly citizens, and that it had not been their intention, in anything that they had done, to exceed their rights, or in any respect to violate the law. In Barr v. Trades Council, 53 N. J. Eq. 101, 30 Atl. 881, the court of errors and appeals of the state of New Jersey, referring to a similar assurance, said:

"The defendants claim, and they are entitled to be credited with being sincere in the contention, that they believe they have, in all matters complained of, acted strictly within the lines of their legal rights. This position justifies us in assuming that, if they had not believed so, and had not been satisfied they were correct in law, the acts challenged would not have been committed, and, if now convinced they are wrong, will not again be attempted."

This court, accepting the statements of counsel in this case, as the like statement was accepted in the New Jersey case, will be at some pains to refer to the authorities, and to set forth the principles of law here applicable, proceeding, first, to consider the cases which have been decided by state courts,—for among these are the earlier cases, —in order that it may be made fully to appear that the federal courts have not been making any new law in reference to strikes or boycotts or labor agitations, but have been following well-established precedents. It will appear later in the opinion that the state courts had for every principle involved and every rule of law stated ample precedent in well-recognized authorities promulgated long prior to their decisions.

In State v. Glidden, 55 Conn. 46, 8 Atl. 890, the defendants were prosecuted for a conspiracy having for its object to compel a newspaper publishing company against its will to discharge its workmen, and to employ such persons as the defendants and their associates should name. This case was decided in February, 1887. It is the first American case in which the word "boycott" is used. That word originated from the efforts of certain Irish tenants to exclude Capt. Boycott from all intercourse with his neighbors because he endeavored lawfully to collect his rents. The supreme court, in State v. Glidden, said:

"It seems strange that in this day, and in this free country,—a country in which law interferes so little with the liberty of the individual,—it should be necessary to announce from the bench that every man may carry on his business as he pleases, may do what he will with his own, so long as he does nothing unlawful, and acts with due regard to the rights of others, and that the occasion for such an announcement should be, not an attempt by government to interfere with the rights of the citizen, nor by the rich and powerful to oppress the poor, but an attempt by a large body of workingmen to control, by means little, if any, better than force, the action of employers."

The court further said that the defendants in effect said to the publishing company:

"It is true we have no interest in your business, we have no capital invested therein, we are in no wise responsible for its losses or failures, we are not directly benefited by its success, and we do not participate in its profits; yet we have a right to control its management, and compel you to submit to our dictation."

The court declared that the bare assertion of such a right was startling, and that:

"Upon the same principle, and for the same reasons, the right to determine what business others shall engage in, when and where it shall be carried on, etc., will be demanded, and must be conceded. The principle, if it once obtains a foothold, is aggressive, and is not easily checked. It thrives by what it feeds on, and is insatiate in its demands. More requires more. If a large body of irresponsible men demand and receive power outside of law, over and above law, it is not to be expected that they will be satisfied with a moderate and reasonable use of it. All history proves that abuses and excesses are inevitable. The exercise of irresponsible power by men, like the taste of human blood by tigers, creates an unappeasable appetite for more."

The court sustained the verdict of guilty against the defendants.

The case of State v. Stewart, 59 Vt. 273, 9 Atl. 559, was a prosecution for conspiracy to hinder and prevent the Ryegate Granite Works, a corporation, from employing certain granite cutters, and to hinder and deter certain laborers from working for said corporation. The court, sustaining the indictments, held that:

"The labor and skill of the workman, the plant of the manufacturer, and the equipment of the farmer, are in equal sense property; every man has the right to employ his talents, industry, and capital as he pleases, free from the dictation of others; and, if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy, whether the means employed are actual violence or a species of intimidation that works upon the mind."

The court further said:

"The exposure of a legitimate business to the control of an association that can order away its employés and frighten away others that it may seek to employ, and thus be compelled to cease the further prosecution of its work,

is a condition of things utterly at war with every principle of justice, and with every safeguard of protection that citizens under our system of government are entitled to enjoy. The direct tendency of such intimidation is to establish over labor and over all industries a control that is unknown to the law, and that is exerted by a secret association of conspirators, actuated solely by personal considerations, and whose plans, carried into execution, usually result in violence and the destruction of property."

The same court in State v. Dyer, decided at the October term, 1894, and reported 67 Vt. 690, 32 Atl. 814, held:

"That a combination of two or more persons to restrain an employer to discharge a particular workman by threatening to prevent his obtaining other workmen, or to constrain a workman to join a certain organization by threatening to prevent him from obtaining work unless he does so, is a criminal conspiracy at common law."

The supreme court of Pennsylvania, in Murdock v. Walker (Jan., 1893) 152 Pa. St. 595, 25 Atl. 492, decided that a court of equity will restrain by injunction discharged employés, members of a union, from gathering about their former employer's place of business, and from following the workmen whom he has employed in place of the defendants, from gathering about the boarding houses of such workmen, and from interfering with them by threats, menaces, intimidation, ridicule, and annoyances on account of their working for the plaintiffs.

The court of errors and appeals of the state of New Jersey, at its October term, 1894, in the case of Barr v. Trades Council, 53 N. J. Eq. 101, 30 Atl. 881, very thoroughly and elaborately considered the questions involved in this case. Before entering upon the discussion the court said:

"No unprejudiced person at this day wishes to place any obstacle in the way of labor organizations conducting their operations within lawful limits. It is unfortunate that, despite the warning and counsel of accredited leaders, the reckless and revengeful among the members, with the vicious and lawless always to be found among the idle, so often take advantage of labor demonstrations to commit acts of violence against persons and property, and thus weaken the sympathy of the public with the system. Yet every one must acknowledge that organization has accomplished much in the past for the benefit of the workingman, and recognize its possibilities to secure to him, in the future, enjoyment of other privileges. But while engaged in this laudable purpose, those who give direction to affairs should not attempt to secure their ends by infringing the lawful rights of others."

The suggestions contained in this quotation are well worthy of consideration by all labor organizations. No class of men stands more in need of the protection of the law and of its safeguards than do laboring men, nor to any class is public sympathy and the support of public opinion more desirable; and to no class will both these be more cordially extended so long as these organizations keep themselves within the limits of law and order. Whenever they exceed such limits, they greatly weaken themselves and the cause they represent, for an overwhelming majority of the American people are so thoroughly in favor of the maintenance and supremacy of law that they will defeat any attempt to pervert or overturn it.

The court, in Barr v. Trades Council, declared that a man's business is his property, and that the right to acquire, possess, and protect property is a natural and inalienable right, which all men have,

with those of enjoying and defending life and property, and of pur·
suing and obtaining safety and happiness. The court said that this
was an echo of Magna Charta, and quoted from Mr. Justice Bradley
in the Slaughter-House Cases, 16 Wall. 36, at page 116, where he
says:

"For the preservation, exercise, and enjoyment of these rights [life, liberty,
and the pursuit of happiness] the individual citizen, as a necessity, must be
left free to adopt such calling, profession, or trade as may seem to him most
conducive to that end. Without this right he cannot be a freeman. This right
to choose one's calling is an essential part of that liberty which it is the ob-
ject of the government to protect; and a calling, when chosen, is a man's
property and right. Liberty and property are not protected where these
rights are arbitrarily assailed."

The court also said:

"This freedom of business action lies at the foundation of all commercial
and industrial enterprises. Men are willing to embark capital, time, and ex-
perience therein, because they can confidently assume that they will be able
to control their affairs according to their own ideas, when the same are not in
conflict with law. If this privilege is denied them; if the courts cannot pro-
tect them from interference by those who are not interested with them; if
the management of business is to be taken from the owner, and assumed by,
it may be, irresponsible strangers,—then we will have to come to the time
when capital will seek after other than industrial channels for investments,
when enterprise and development will be crippled, when interstate railroads
and canals and means of transportation will become dependent on the pa-
ternalism of the national government, and the factory and the workshop sub-
ject to the uncertain chances of co-operative systems."

The court found that the acts of the defendants practically in-
fringed upon the exercise of this right by Mr. Barr. The defendants
were 18 bodies known as "labor unions," embracing many trades in
the city of Newark, affiliated in a society or representative body
known as the "Essex Trades Council." One of these unions was in-
corporated; the others were not. The Essex Trades Council itself
was a voluntary association, composed of delegates or representatives
chosen thereto by each of the 18 different unions or associations. Mr.
Barr, as proprietor of the daily morning newspaper in Newark, de-
termined to employ plate or stereotyped matter in the making up
of his paper for publication. All the employés were members of the
local typographical union, which had declared against the use of
plate matter in the city of Newark, as Mr. Barr well knew. The
Essex Trades Council then undertook to boycott Mr. Barr's news-
paper, by distributing circulars, by issuing an official bulletin, and
by undertaking to persuade the public to withhold support from the
paper. The defendants denied that they had made any threats, or
attempted to intimidate or coerce any of the advertisers or patrons
of the Times, and claimed that everything was done in a peaceable
and orderly manner, but the court said:

"It is true, there was no public disturbance, no physical injury, no direct
threat of personal violence, or of actual attack on or destruction of tangible
property, as a means of intimidation or coercion. Force and violence, how-
ever, while they may enter largely into the question in a criminal prosecu-
tion, are not necessarily factors in the right to a civil remedy. But, even in
criminal law, I do not understand that intimidation, even when a statutory
ingredient of crime, necessarily presupposes personal injury or the fear there-
of. The clear weight of authority undoubtedly is that a man may be intimi-·

·dated into doing or refraining from doing, by fear of loss of business, prop-
·erty, or reputation, as well as by dread of loss of life or injury to health or
·limb; and the extent of this fear need not be abject, but only such as to
overcome his judgment, or induce him not to do or to do that which otherwise
·he would have done or left undone.   There can be no reasonable dispute that
the whole proceeding or boycott in this controversy is to force Mr. Barr, by
:fear of loss of business, to conduct that business, not according to his own
.judgment, but in accordance with the determination of the typographical
union, and, so far as he is concerned, it is an attempt to intimidate and
·coerce."

The court then proceeded to a review of the cases, and the dis-
·cussion of the jurisdiction in equity, and awarded an injunction as
prayed.

The case of Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307, was
·decided in June, 1888.   It was there held that banners displayed in
front of a manufacturer's premises, with inscriptions· calculated to
·injure his business and to deter workingmen from entering into and
·continuing in his employ, constituted a nuisance, which equity would
·restrain by injunction.   The court said that the plaintiffs were not
restricted to their remedy at law, but were entitled to relief by
·injunction; that the scheme in pursuance of which the banners were
displayed and maintained was to injure the plaintiff's business, by
·intimidating workingmen, so as to deter them from keeping and
·making engagements with the plaintiff.   The banners were a stand-
·ing menace to all who were or wished to be in the employment of
the plaintiffs, to deter them from entering his premises, and main-
:taining them was a continuous unlawful act, injurious to his· busi-
ness and property, and a nuisance such as a court of equity would
·grant relief against.

The latest case in Massachusetts is Vegelahn v. Guntner, decided
·October, 1896, and reported in 44 N. E. 1077.   The defendants in that
·case conspired to prevent plaintiff from getting workingmen, and
thereby to prevent him from carrying on his business, unless and
·until he would adopt a certain schedule of prices.   The means adopt-
·ed were persuasion and social pressure, threats of personal injury or
unlawful harm conveyed ·to persons employed or seeking employ-
·ment, and a patrol of two men in front of plaintiff's factory, main-
tained from half past 6 in the morning until half past 5 in the
:afternoon, on one of the busiest streets of Boston.   The court said
that intimidation was not limited to threats of violence or of phys-
·ical injury to person or property; that it had a broader signification,
:and there might be a moral intimidation, which was illegal, includ-
ing patrolling or picketing, under the circumstances stated in the
case.   The court further said that the patrol was an unlawful inter-
·ference both with the plaintiff and with the workmen, within the
.principle of many cases, and, when instituted for the purpose of in-
·terfering with his business, it became a private nuisance.   The de-
·fendants in that case contended that the acts complained of were jus-
tifiable, "because they were only seeking to secure better wages for
.themselves, by compelling the plaintiff to accept their schedule of
·wages."   The court was of opinion that that motive or purpose did

not justify maintaining a patrol in front of the plaintiff's premises, as a means of carrying out their conspiracy, and added:

"A combination among persons merely to regulate their own conduct is within allowable competition, and is lawful, although others may be indirectly affected thereby. But a combination to do injurious acts, expressly directed to another, by way of intimidation or constraint, either of himself or of persons employed or seeking to be employed by him, is outside of allowable competition, and is unlawful."

In support of this proposition the court cited a long list of cases. Upon the point, urged, also, in argument in this case, that the defendants' acts might subject them to an indictment, the court said that that fact did not prevent a court of equity from issuing an injunction. "It is true that, ordinarily, a court of equity will decline to issue an injunction to restrain the commission of a crime; but a continuing injury to property or business may be enjoined, although it may also be punishable as a nuisance or other crime." In support of this proposition the court cited a long list of cases, including the following: Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307; Cranford v. Tyrrell, 128 N. Y. 341, 28 N. E. 514; Gilbert v. Mickle, 4 Sandf. Ch. 357; Port of Mobile v. Louisville & N. R. Co., 84 Ala. 115, 4 South. 106; and the following English cases: Emperor of Austria v. Day, 3 De Gex, F. & J. 217; Loog v. Bean, 26 Ch. Div. 306; Monson v. Tussaud [1894] 1 Q. B. 671.

The court further held that such a conspiracy, in order either to prevent persons from entering plaintiff's employment or to prevent persons in his employment from continuing therein, was unlawful, even though such persons were not bound by contract to enter into or continue in his employment. Moores & Co. v. Bricklayers' Union No. 1, 23 Wkly. Law Bul. 48, decided by the superior court of Cincinnati in general term, is a case much quoted, in which it was held that a combination by a trade union and others to coerce an employer to conduct his business with reference to apprentices and the employment of delinquent members of the union, according to the demand of the union, by injuring his business through notices sent to his customers and material men, stating that any dealings with him will be followed by similar measures against such customers and material men, is an unlawful conspiracy. Judge Taft, in delivering the opinion of the court, said:

"We are of opinion that, even if acts of the character and with the intent shown in this case are not actionable when done by indivduals. they become so when they are the result of combination, because it is clear that the terrorizing of the community by threats of exclusive dealing in order to deprive one obnoxious member of means of sustenance will become both dangerous and oppressive."

The latest case in any state court—Charles Curran against Louis Galen, as president (known under the title of "Master Workman") of Brewery Workingmen's Local Assembly 1796, Knights of Labor—was decided March 2, 1897, by the court of appeals of the state of New York, and will appear in 152 N. Y., at page 33, 46 N. E. 297. The court there held—First, that the organization or co-operation of workingmen is not of itself against any public policy, and must be

regarded as having the sanction of law, when it is for such legitimate purposes as that of obtaining an advance in the rate of wages or compensation, or of maintaining such rate; second, if the purpose of an organization or combination of workingmen is to hamper or restrict the freedom of the citizen in pursuing his lawful trade or calling, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization, and to come under its rules and conditions, under the penalty of the loss of their positions and of deprivation of employment, such purpose is against public policy, and unlawful; third, the fact that a contract between the workingmen's organization and an employers' association was entered into on the part of the employers, with the object of avoiding disputes and conflicts with the workingmen's organization, does not legalize a plan of compelling workingmen not in affiliation with the organization to join it, at the peril of being deprived of their employment. With reference to organizations of workingmen the court said:

"The social principle which justifies such organizations is departed from when they are so extended in their operation as either to intend or to accomplish injury to others. Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper or to restrict that freedom, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization, or to come under its rules and conditions, under the penalty of the loss of their positions, and of deprivation of employment, then that purpose seems clearly unlawful, and militates against the spirit of our government and the nature of our institutions. The effectuation of such a purpose would conflict with that principle of public policy which prohibits monopolies and exclusive privileges. It would tend to deprive the public of the services of men in useful employments and capacities."

The court, further along in the course of the opinion, said:

"The sympathies or the fellow feeling which, as a social principle, underlies the association of workingmen for their common benefit, is not consistent with a purpose to oppress the individual who prefers by single effort to gain his livelihood. If organization of workingmen is in line with good government, it is because it is intended as a legitimate instrumentality to promote the common good of its members."

The English cases are in accord with the American cases above cited. Lord Campbell, C. J., in charging the jury in Reg. v. Hewitt, 5 Cox, Cr. Cas. 162, said:

"By law every man's labor is his own property, and he may make what bargain he pleases for his own employment. Not only so; masters or men may associate together. But they must not, by their association, violate the law. They must not injure their neighbor. They must not do that which may prejudice another man. The men may take care not to enter into engagements of which they do not approve, but they must not prevent another from doing so. If this were permitted, not only would the manufacturers of the land be injured, but it would lead to the most melancholy consequences to the working classes."

In Reg. v. Druitt, 10 Cox, Cr. Cas. 592, Bramwell, B., said:

"No right of property or capital, about which there has been so much declamation, is so sacred or so carefully guarded by the law of this land as that of personal liberty. * * * But that liberty is not liberty of the body only. It is also a liberty of the mind and will; and the liberty of a man's

mind and will—to say how he should bestow himself and his means, his talents, and his industry—is as much a subject of the law's protection as is that of his body. * * * And if any set of men agree among themselves to coerce that liberty of mind and thought by compulsion and restraint, they would be guilty of a criminal offense, namely, that of conspiring against the liberty of mind and freedom of will of those towards whom they so conduct themselves. * * * The public has an interest in the way in which a man disposes of his industry and his capital; and if two or more persons conspired, by threats, intimidation, or molestation, to deter or influence him in the way in which he should employ his industry, his talents, or his capital, they would be guilty of a criminal offense."

In Steamship Co. v. McGregor, 23 Q. B. Div. 598, Lord Justice Bowen said:

"Of the general proposition that certain kinds of conduct, not criminal in any one individual, may become criminal if done by combination among several, there can be no doubt. The distinction is based on sound reason, for a combination may make oppressive or dangerous that which, if it proceeded only from a single person, would be otherwise; and the very fact of the combination may show that the object is simply to do harm, and not to exercise one's own just rights."

Coltman, J., in Gregory v. Duke of Brunswick, 6 Man. & G. 953, illustrates the proposition by the act of hissing in a public theater, which is prima facie a lawful act, and, "even if it should be conceded that such an act, though done without concert with others, if done from a malicious motive, might furnish a ground of action, yet it would be difficult to infer such a motive from the isolated action of one person, unconnected with others."

In Reg. v. Rowlands, 17 Adol. & E. (N. S.) 671, where there was a combination to prevent certain workingmen from continuing in the service of their employers, and thereby to compel the employers to change the mode of conducting their business, the court of queen's bench approved of the charge given to the jury by Mr. Justice Erle that:

"A combination for the purpose of injuring another is a combination of a different nature, directed personally against the party to be injured; and the law allowing them to combine for the purpose of obtaining a lawful benefit to themselves gives no sanction to combinations which have for their immediate purpose the hurt of another. The rights of workmen are conceded; but the exercise of free will and freedom of action, within the limits of the law, is also secured equally to the masters. The intention of the law is, at present, to allow either of them to follow the dictates of their own will, with respect to their own actions and their own property, and either, I believe, has a right to study to promote his own advantage, or to combine with others to promote their mutual advantage."

All these and many other English authorities will be found among the citations in the American cases referred to in this opinion, and they fully support those cases. Without referring to a single federal case, there is ample authority upon all the questions involved in the consideration of the motion which has been argued and submitted to this court. Nevertheless, it will be instructive, and I trust beneficial, to review, briefly as possible, some of the decisions of the federal courts.

In Casey v. Typographical Union, 45 Fed. 135, decided January 31, 1891, it was held that a combination or a conspiracy, by a trades-

union, to boycott a newspaper for refusing to unionize its office, was illegal, and would be enjoined by a court of equity. The court, in considering the contention, for defendants, that no threats were used and there was no intimidation, only courteous requests, and "fair, although sharp and bitter competition," cited In re Wabash R. Co. 24 Fed. 217, where, during a strike organized to resist a reduction of wages, a printed notice was sent to the several foremen of the shops of the railway company as follows:

"You are requested to stay away from the shop until the present difficulty is settled. Your compliance with this will command the protection of the Wabash employés. But in no case are you to consider this as an intimidation."

The court, in holding that that was an unlawful interference with the management of the road by the receiver, and a contempt of court, said that:

"The statement in all these notices that they are not to be taken as intimidations goes to show beyond a reasonable doubt that the writer knew he was violating the law, and by this subterfuge sought to escape its penalty."

The court, in Casey v. Typographical Union, also cited U. S. v. Kane, 23 Fed. 748, where Judge (now Justice) Brewer, by way of illustrating what is a threat, supposes that one of two workmen is discharged. The other is satisfied with his employment, and wishes to remain. The discharged workman comes, with a party of his friends, armed with revolvers and muskets, and says: "Now, my friends are here. You had better leave. I request you to leave." In terms there was no threat, only a request; but it was backed by a demonstration of force intended and calculated to intimidate, and the man leaves really because he is intimidated. "Again," said the judge, "armed robbers stop a coach. One of their number politely requests the passengers to step out and hand over their valuables. To the charge of robbery the defense is made that there was no violence; there were no threats; there was only a polite request, which was complied with." Judge Brewer properly said that any judge who would recognize such a defense deserved to be despised.

In Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542, it was held that a combination of two or more persons to accomplish, by concerted action, either a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful by criminal or unlawful means, is a conspiracy.

It was held in Thomas v. Railway Co. (the Phelan Case) 62 Fed. 803, that a combination to incite the employés of all the railways in the country to suddenly quit their service without any dissatisfaction with the terms of their employment, thus paralyzing all railway traffic in order to coerce the railroad companies and the public into compelling an owner of cars used in operating the roads to pay his employés more wages, they having no lawful right so to compel him, is an unlawful conspiracy, by reason of its purpose, whether such purpose is effected by means usually lawful or otherwise. That the employés of the receiver of the road had the right to organize into or to join a labor union, which should take joint action as to their terms of employment, was conceded; the court stating that, as they had

labor to sell, if they should stand together they would be often able to command better prices for their labor than when dealing singly with rich employers, because the necessities of a single employé might compel him to accept any terms offered him. In illustration the court said that if, when the receiver made a reduction of 10 per cent. in the wages of his employés, Phelan had come to Cincinnati, and urged and succeeded in maintaining a peaceable strike, he would not have been liable to contempt, even if the strike seriously impeded the operation of the road under the order of the court, and that his action in giving advice or issuing an order based on unsatisfactory terms of employment would have been entirely lawful, but that his coming to Cincinnati, and his advice to the employés to quit work, had nothing to do with their terms of employment. They were not dissatisfied with their service or their pay. His coming was to carry out the purpose of a combination of men, and as a part of that combination to incite the employés of all Cincinnati roads to quit work. The plan of this combination was to inflict pecuniary injury on Pullman by compelling the railway companies to give up using his cars, and in the event of their refusal so to do to inflict pecuniary injury on them by inciting their employés to quit their service and thus paralyze their business. That combination, the court held, was for an unlawful purpose, and was conspiracy; citing Angle v. Railway Co., 151 U. S. 1, 14 Sup. Ct. 240. The court also held that the combination was unlawful without respect to the contract feature, because it was a boycott. The court recognized that the employés had the right to quit their employment, but declared that they had no right to combine to quit, in order thereby to compel their employer to withdraw from a profitable relation with a third person for the purpose of injuring him, when that relation had no effect whatever on the character or reward of their service. Phelan was held guilty of contempt, and sentenced to imprisonment.

The supreme court of the United States, in the Debs Case, 158 U. S. 564, 15 Sup. Ct. 900, held that the jurisdiction in equity to apply the remedy by injunction when any obstruction was put upon highways, natural or artificial, to impede interstate commerce or the carrying of mails, was not ousted by the fact that the obstructions were accompanied by or consisted of acts in themselves violations of the criminal law, or by the fact that the proceeding by injunction is of a civil character, and may be enforced by proceedings in contempt, inasmuch as the penalty for a violation of such injunction is no substitute for and no defense to a prosecution for criminal offenses committed in the course of such violation. This authority, which is conclusive in this court, disposes of the objection, made in this case, that if the defendants had committed the acts charged against them they were amenable to the criminal laws and should be put upon trial.

The remedy by injunction was not first applied in the United States, either by state courts or by the federal courts. Mr. Stimson, in his handbook on the Labor Law of the United States, at page 315, says that it is traced back to the leading case of Spinning Co. v. Riley, L. R. 6 Eq. 551, decided in 1868, which was prior to any of the American cases. He adds that that case did not announce any new doc-

trine, but rather the revival of a very old one, referring to the exercise of the chancellor's authority in the reign of Richard II. to repress disorderly obstructions to the course of law. Spinning Co. v. Riley was overruled by the court of chancery appeals in Assurance Co. v. Knott, 10 Ch. App. 142, in 1874; Lord Chancellor Cairns deciding (and Sir W. M. James, L. J., and Sir G. Mellish, L. J., concurring) that the court in chancery has no jurisdiction to restrain the publication of a libel, as such, even if it is injurious to property. The court, in Spinning Co. v. Riley, enjoined the issuing of placards and advertisements intending and having the effect to intimidate and prevent workmen from hiring themselves to the plaintiffs; that being the only act complained of, and the court finding that the plaintiffs were thereby prevented from continuing their business and that the value of their property was thereby seriously injured. Vice Chancellor Malin's opinion is a strong presentation of the doctrine recognized by him, but no American court, state or federal, has gone to the length of that case, nor beyond the doctrine stated by the supreme court of the United States in the Debs Case.

It conclusively appears, from the authorities above referred to, that the English courts, the American state courts, and the federal courts are in perfect harmony, and that, while they recognize the right of employés of whatever rank or degree to combine for the purpose of resisting any measures of oppression or coercion by their employers, and even for the purpose of instituting strikes and adopting other measures for their own protection or for the bettering of their condition, they are agreed that they must not interfere with the rights of employers to manage their own business in their own way, so long as they do not trespass upon the rights of others.

Counsel for defendants in this case insisted that his clients had the right as individuals to solicit and persuade employés of complainant to give up their situations, insisting, also, that the employés were under no contracts to labor for any specified period. Counsel then advanced the proposition that, if defendants had the right singly to persuade complainant's employés to quit work, they had the right to do so in companies or in mass, and that they had the right to congregate for that purpose in the public streets, and that therefore the congregating in the vicinity of complainant's mill and plant was lawful, and should not be restrained by the court. That complainant's employés were under no term contracts is, I think, established by the evidence. But the conclusion deduced by counsel, although ingenious, is altogether unsound. It is negatived by Casey v. Typographical Union, by U. S. v. Kane, by Pettibone v. U. S., by Thomas v. Railway Co., and by the Debs Case. That the defendants might, as counsel put it, peaceably and quietly persuade complainant's employés to quit work, is not, and cannot be, successfully denied. But persuasion, with the hootings of a mob and deeds of violence as auxiliaries, is not peaceable persuasion. As to the proposition that defendants were only exercising their constitutional rights, the court commends to their perusal the recent case of Garrett v. T. H. Garrett & Co., 24 C. C. A. 173, 78 Fed. 472, decided December 8, 1896. The appellants were manufacturers of snuff, known to the trade as "Gar-

rett's Snuff," and sued to restrain defendant company from using the name "Garrett" on packages and cans of snuff manufactured by it and placed upon the market for sale. It was contended for the defendant that every man has the right to the use of his own name in business, and, as to the order of injunction below restraining defendant from using white paper for its labels, that every person has a constitutional right to use white paper. The court said:

"These propositions, in the abstract, are undeniably true; but counsel for the time overlooked the fact that, wherever there is an organic law, wherever a constitution is to be found as the basis of the rights of the people, and as the foundation and limit of the legislation and jurisprudence of a government, there the mutual rights of individuals are held in highest regard, and are most jealously protected. Always, in law, a greater right is closely related to a greater obligation. While it is true that every man has a right to use his own name in his own business, it is also true that he has no right to use it for the purpose of stealing the good will of his neighbor's business, nor to commit a fraud upon his neighbor, nor a trespass upon his neighbor's rights or property; and, while it is true that every man has a right to use white paper, it is also true that he has no right to use it for making counterfeit money nor to commit a forgery. It might as well be set up, in defense of a highwayman, that, because the constitution secures to every man the right to bear arms, he has a constitutional right to rob his victim at the muzzle of a rifle or revolver."

Counsel for defendants closed his argument with a somewhat impassioned appeal to the court, coupled with the expression of his hope and confidence that the decision would not be calculated to drive his clients to become anarchists. So long as labor organizations keep themselves within the limits of law, they will not be interfered with by courts, and they will have the sympathy and good will of a vast majority of well-disposed citizens. When they exceed those limits, they will be restrained by the courts, and dealt with, whatever the consequences may be, and they will lose the sympathy and good will of the public. The extraordinary character of the appeal made to the court justifies me in adding that the courts will be ready for the emergency whenever and wherever the spirit of anarchy may manifest itself, whether within or without the lodges, and the American people, if need be, will rise in their majesty and their might, and crush it as a trip-hammer would crush an eggshell.

Upon the facts of this case, and upon the law as stated in the authorities cited, the complainant's motion for a temporary injunction will be granted. A bond of $2,000 will be required.