### MACKALL v. RATCHFORD et al.

(Circuit Court, D. West Virginia. August 21, 1897.)

1. INJUNCTION—MARCHING ON HIGHWAY—INTIMIDATING EMPLOYES—CONTEMPT.

An injunction was granted and served on defendants, restraining them and all others from in any way interfering with the management, operation, or conducting of the mines named in the bill, either by menaces, threats, or intimidation of any character used to prevent the employés of said mines from going to or from the same, or from engaging in their usual business of mining. Defendants joined a body of over 200 striking miners in marching, with music and banners, past one of said mines and the homes of the miners working therein, marching and countermarching for three days along the public highway between the mine and the homes of the miners, halting in front of the mine, and taking positions on each side of the road which the miners must cross in going to and from the mine, before daylight and late at night, at the time when such miners were going to and from their work. The avowed object of the strikers was to influence the miners to join in the strike, and this marching and halting in front of the mine were with the evident intent to accomplish this object by intimidation, and some of the miners were thereby intimidated and kept away from their work. *Held*, that defendants were guilty of contempt.

2. SAME—USE OF HIGHWAY.

Any use of a public highway which prevents its reasonable, seasonable, and ordinary use by the general public, or by citizens, for purposes connected with their regular business, is unlawful, and in a proper case the continuance of such use may be enjoined.

3. SAME—MINE OWNER—UNLAWFUL INTERFERENCE.

The owner of a mine is entitled to the aid of the courts to protect him, against the unlawful interference of others, in the continued enjoyment of the right to operate his mine, the right to employ the labor of those willing to work, and his right to the use of the highway leading to his mine, for himself and his employés.

In Chancery. In the matter of the contempt proceedings against Patrick Harney, Ed. L. Davis, J. L. Higginbotham, et al.

A. B. Fleming, for complainant.
John J. Davis, John W. Davis, and W. Scott, for defendants.

GOFF, Circuit Judge. As to the law applicable to the matter now under consideration counsel have not differed, and the court has no trouble. It is concerning the facts—what they prove, and their proper application to the law involved—that counsel have expressed differences, and the court is required to decide. Many matters foreign to the issue now presented have been referred to by counsel and testified about by witnesses, but the court will exclude them from its consideration. Matters referring to "free speech," "natural rights," and the "liberty of the citizen" are not now involved in this issue nor are they in danger. They will survive this ordeal, and it is to be hoped that they will be further endeared to us all, if that be possible, by our mutual experience herein and the incidents connected therewith. The right of free speech has not been abridged, nor in any manner interfered with. The "organizer" has spoken to his heart's content here, there, and everywhere. The "camp" has heard him, and been electrified by his eloquence. City, town, and hamlet have been visited by him, and have given him generous welcome. Public build-

ings have been thrown open, street corners utilized, the crossroads and highways called into requisition. The right of the people to assemble and discuss matters in which they feel an interest has had an exemplification during the last month in this and adjoining states that has been pleasing to our citizenship, and as gratifying to all true lovers of republican government as it has been unwelcome and unexpected to the agitator and the demagogue, who it seems delight in drawing lurid pictures of the days yet to come, when "liberty" shall have perished from the face of the earth, and "free speech" shall be but the dim remembrance of a dream long passed, recalling but faintly the days when freedom yet tarried among men, and was worshipped by those who called themselves "freemen."

The simple question here is, are these defendants in contempt of this court? On the 16th inst. this court granted an injunction restraining the defendants and all others from in anywise interfering with the management, operation, and conducting of the mines in the bill mentioned, either by menaces, threats, or any character of intimidation used to prevent the employés of said mines from going to or from the same, or from engaging in their usual business of mining. All persons were restrained from entering upon the property of the Montana Coal & Coke Company for the purpose of interfering with the employés of said company, either by intimidation, or by the holding of either public or private assemblages upon said property, or in any way molesting, interfering with, or intimidating the employés of that company so as to induce them to abandon their work in the said mines. This injunction was served on a number of the defendants early on the morning of the 17th inst. It was also served on other of the defendants, together with an additional or supplemental and construing order, on the morning of the 18th inst. If the defendants were aware that the court had passed the decree granting the injunction mentioned, if they were aware of its terms and import, and if they then interfered with or intimidated the employés of said coal company, thereby preventing them from going to or from their work, or causing them to abandon the same, then they are guilty of the contempt charged, and should be, must be, and will be punished. The strikers had the right to quit work themselves, and they had the right to induce other miners, by peaceable means, by the persuasive force of public or private argument exerted in a lawful way, to also quit work and join them. But it must be kept in mind that the miner who still desired to work had the same right to do so as the miner to quit work; and also it should be remembered that the owners of the mines, individual or company, had the right to operate the same, the right to employ the labor of those willing to work, the right to use the highway leading to the mines for themselves and for their employés, even as had the strikers to quit work, the miner to go on with his work, or the agitator to indulge in the right of "free speech." It seems from the evidence that but few of the miners employed at the Montana mines had joined the strikers. All efforts to induce them to do so had apparently failed. At this juncture a company of marching strikers, mostly from Monongah, went into camp about one mile from the Montana mines. During Monday, Tuesday, and Wednes-

day, this company, under command of its officers, with music and banners, marched and countermarched along the county road running through the property of the Montana Coal & Coke Company. This marching was very early in the morning and in the afternoon, at times when the miners of said company were either going to or coming from their work. The marching was from the camp down to the mine opening, then back to the village where the miners lived, thence again past the mine opening, and so on, "to and fro," during certain hours of the morning and afternoon. They did not march past the property of the company, for the reason, as stated by their leader, that the river stopped them. The marching was therefore from the camp to the river, and from the river back to the camp, always by the mine opening and the miners' homes. There was an object in this, and the intent will be disclosed by the facts. These miners had refused to join the strikers, and had neglected to attend the strikers' meeting, evidently preferring to remain at work. The camp was established near them for the purpose of influencing them. Was that influence to be exerted, and was it exerted, in a lawful and proper manner? The answer to that question determines the guilt or innocence of these accused. In endeavoring to influence the miners to join them, did the strikers prevent them from going to or from their work, and did they use any character of intimidation in so doing?

A body of men, over 200 strong, marching in the early hours of the morning, before daylight, halting in front of the mine opening, and taking position on each side of the public highway for a distance of at least a quarter of a mile, at the exact places where the miners were in the habit of crossing that highway for the purpose of going from their homes to their work, is at least unusual, and, in the state of excitement usually attending such occasions, neither an aid to fair argument, nor conducive to the state of mind that makes willing converts to the cause thus championed. That the marching did intimidate quite a number of the miners is clear, if the evidence offered is to be believed; and the court finds it uncontradicted and entitled to credence. The court is also forced to conclude, from all the facts and circumstances detailed by the witnesses, from the object the marching men had in view, and from the locality where they marched, and its topography, that the intention of the marching strikers was to interfere with the operation of the Montana mines, with the miners engaged in working said mines,—to intimidate them, and thereby induce them to abandon their work, and then secure their co-operation in closing the mines. The marching men seemed to think that they could go and come on and over the county road as they pleased, because it was a public highway. But this was a mistake. The miners working at Montana had the same right to use the public road as the strikers had, and it was not open and free to their use when it was occupied by over 200 men stationed along it at intervals of three and five feet,—men who, if not open enemies, were not bosom friends. That some miners passed through this line is shown. That others feared to do so is plain. That the marching column intended to interfere with the work at the mines would be foolish to deny. A highway is a way over which the public at large have a right of pas-

sage. It is a road maintained by the public for the general convenience. True, the strikers had a right to march over it as passengers just the same as all other citizens; but they had no right to make it a parade ground, or stop on its sideways at frequent intervals, and by the hour, at times when other people who had the same right to its use were in the habit of using it for purposes connected with their daily avocations. The miners of the Montana mines, as well as the owners of that property, had the same right to use the public road as had the marching strikers. It seems to the court that the men whose work is interrupted and the people whose property is damaged by the improper use and occupation of the highway are the people who have the true grounds of complaint because of the improper use of what in the early books of the law is called the "king's highway." The building in which we are now holding this court is located on the corner of Third and Pike streets, Clarksburg. All the citizen of that town can use those streets for purposes connected with their business. All persons properly deporting themselves can pass along and upon them for all proper business matters, or for the mere purpose of transit; and all persons, due regard being had for the public interest and safety, may parade, with banners, flags, and bands of music, along and over said streets at reasonable times and seasonable hours, provided the same does not prevent the reasonable and seasonable use of said streets by those entitled to the same. If such use should close the business houses along said streets, by preventing employés from reaching them, then, if such parades were not prevented by the city authorities, the owners of property so affected would be entitled to the aid of the courts in protecting their rights. No one portion of the community has a right to march along those streets day after day, night after night, and station themselves along them at intervals of three or five feet, for hour after hour, thereby preventing the owners of property located thereon from reaching the same in person, or by their clerks or other employés, for purposes connected with their regular business. Under such circumstances the police of the city would either move the column along, out of the way of the public business, or take into custody the men who without authority obstruct the streets and public highways. The marching men had then no such right on the county road as they claimed.

That the parties now in custody knew that the injunction had been issued is not denied,—is plain from the evidence. They spoke of it jocularly, mostly,—now and then resentfully and disrespectfully. Such terms as these passed along the line: "We are used to papers like that." "We will take the consequences." "I will eat mine for breakfast." The officers were careful in explaining its terms, and, I may say, in beseeching the strikers not to violate them. They told the marchers to march on and pass by if they wished to, but not to march and countermarch "to and fro" by the mines, because such marching was prohibited by the court. But the advice was not heeded, the disregard of the court's order continued, and the conduct that constituted violation of the injunction was openly resorted to and persistently maintained. These defendants are all guilty of the contempt charged. Their conduct, in connection with their knowl-

edge of the action theretofore taken by this court, concerning the injunction referred to, was evidently in violation of the provisions of section 725 of the Revised Statutes of the United States. What should the punishment of the court be? Outside of their conduct in this particular, the demeanor of those who so marched has been most commendable. They have indulged in no threats, nor has loud, boisterous, or taunting language been used. They have been sober and decent, mindful of their own interests, and, with the exception noted, respectful of the rights of others, and observant of the requirements of the law. They impress me as thoroughly honest in their claim that they had the right to march and act as they did, because they were on the "public highway." In my judgment, they were in that particular mistaken, having been badly advised thereto; but nevertheless such belief, honestly entertained by them, deprives their disobedience to the court's decree of malice, takes the sting out of the contempt found, and suggests a punishment that will be as light as due regard for the proprieties will admit of. The parties have already been in custody for three days. Let them be confined in the jail of Harrison county, W. Va., for the further period of three days from this date. But let it not be supposed hereafter, now that attention has been called to the matter and the law, that other and further infractions of the decrees and orders of this court will be so lightly punished. In this case, for the reasons mentioned, justice has been tempered with mercy; but if, with the light of this investigation in their pathway, these defendants shall persist in disregarding the decrees of this court duly entered in causes properly before it, then let it be remembered that mercy shown to contempt under such circumstances would be not only a crime, but the death of justice.