UNITED STATES v. SWEENEY. SAME v. TALLEMENE et al. SAME v. HEFFLEY. SAME v. BARRICK et al. SAME v. LINGO et al. SAME v. BUNCH et al.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. July 22, 1899.)

1. INJUNCTION—CONSPIRACY.

It is settled law that the court had jurisdiction of the case in which the original injunction was granted. Wire Co. v. Murray, 80 Fed. 811; Mackall v. Ratchford, 82 Fed. 41; U. S. v. Debs, 64 Fed. 724; In re Debs, 15 Sup. Ct. 900, 158 U. S. 573.

2. CONTEMPT—PROCEDURE.

There is no settled practice in contempt proceedings. The proceedings in this case conform to the practice elsewhere, but, if irregular, no question of irregularity has been raised. For practice in contempt proceedings, see Fischer v. Hayes, 6 Fed. 76; U. S. v. Memphis & L. R. R. Co., Id. 237; U. S. v. Wayne, 28 Fed. Cas. 504.

3. SAME—DENIAL OF ACTS ALLEGED.

Parties cannot conclusively purge themselves of contempt by filing answers denying acts alleged against them. U. S. v. Debs, 64 Fed. 7 15; In re Debs, 15 Sup. Ct. 900, 158 U. S. 594.

**4. SAME—VIOLATION OF INJUNCTION.**
That the court has the power, and that it is its duty, to punish a person violating its injunction, is a principle universally recognized, and as old as equity jurisprudence. Wire Co. v. Murray, 80 Fed. 811; In re Debs, 15 Sup. Ct. 900, 158 U. S. 595.

**5. SAME.**
"To render a party amenable to an injunction, it is not necessary that he should have been a party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears to have had actual notice." Ex parte Lennon, 17 Sup. Ct. 658, 166 U. S. 549.

**6. INJUNCTION—PROTECTION OF PROPERTY.**
Injunction, protecting property and persons engaged in lawful business enterprises, in proper cases, and where the remedy at law is inadequate and the injury irreparable, is not new, nor is it a modern invention of the federal courts. Wire Co. v. Murray, 80 Fed. 811.

**7. CONTEMPT—TRIAL BY JURY.**
A person who violates an injunction is not entitled, under the constitution, to a trial by jury. In re Debs, 15 Sup. Ct. 900, 158 U. S. 599.

**8. SAME—PUNISHMENT.**
"A court enforcing obedience to its orders by proceedings for contempt is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to." In re Debs, 15 Sup. Ct. 911, 158 U. S. 599.

**9. CONSTITUTIONAL LAW—PURSUIT OF LIVELIHOOD.**
The fourteenth amendment to the constitution of the United States secures, not only the right of the citizen to be free from mere physical restraint of his person, but to be free in the enjoyment of all his faculties; to use them in all lawful ways; to live and work where he will, and earn his livelihood in any lawful manner; to pursue any livelihood or avocation, and for that purpose to enter into all contracts that may be proper, necessary, and essential to his carrying out the purposes above mentioned. Butchers' Union Slaughter-House Co. v. Crescent City Live-Stock Landing Co., 4 Sup. Ct. 652, 111 U. S. 757; Allgeyer v. Louisiana, 17 Sup. Ct. 427, 165 U. S. 589.

**10. CONSPIRACY—PARTIES.**
Where two or more persons combine with the intent to do an unlawful thing, and, in the prosecution of the unlawful enterprise, commit some crime not originally contemplated, all are equally guilty, under the law. U. S. v. Kane, 23 Fed. 751.

(Syllabus by the Court.)

James K. Barnes, U. S. Atty., and Jos. M. Hill, for the United States.

William M. Cravens and Edgar E. Bryant, for defendants.

ROGERS, District Judge. The above cases were consolidated for the purposes of trial, and one opinion will be delivered. The importance of these cases makes it necessary that a brief résumé of the facts and circumstances, as shown by the record, leading up to these prosecutions, be stated:

On the 22d day of April, 1899, the Kansas & Texas Coal Company filed its bill in equity in this court against William Denney and others (whose names will hereafter appear), and prayed for an injunction. A temporary restraining order was issued, and service had upon the defendants. None of the defendants ever entered their appearance, and on the 6th day of June a decree pro confesso was had, and afterwards, on the 7th day of July, 1899, a final decree was rendered, and the injunction made perpetual. The bill, in apt terms,

alleged that said company was a corporation organized under the laws of the state of Missouri, and a citizen and resident of that state, and that the defendants were citizens of the state of Arkansas, and residents of the Ft. Smith division of the Western district of Arkansas. The defendants were William Denney, Thomas Sweeney, Dave McLane, Hugh Gaffney, Virgil Davenport, Dan Bales, Charley Robinson, George Williams, William Law, W. P. Fitzgerald, Charlie Parr, George Bunch, Gus Galloway, Bruce Jordan, Lee Anderson, A. Mottslinger, James McNelly, Tom McGuire, J. A. Piland, Lee Shaw, George Simmons, Jonathan Thomas, J. L. Tracy, J. K. Miller, and the officers and members of the local (or Huntington) union or society of the United Mine Workers of America, District No. 21. Service of subpœna in chancery, and the injunction was duly served upon all of them, except Victor King and A. Mottslinger, against whom no decree was taken. In addition to the service, the plaintiff company caused said injunction to be printed on handbills about 12 by 20 inches in size, and the marshal posted the same in many of the most public places in the town of Huntington, upon the company property, and along the public highways between plaintiff's mines and the town, and also distributed large numbers of them to the strikers and others.

The bill alleges, in substance, the following facts:

That said company owns large property interests in the state of Arkansas, situate at and near the town of Huntington, in the county of Sebastian, in the Ft. Smith division of the Western district of Arkansas. That it has been engaged in the business of mining and selling coal in said town, and has property there used and employed in the said business of the value of many thousands of dollars. That during the month of February, 1899, and prior thereto, it had employed in its mines at Huntington, Arkansas, about four hundred miners, who were actively engaged in mining coal for it, who were making fair wages for their labor, and doing their work to the satisfaction of the plaintiff, and, so far as plaintiff is informed and believes, its employment was satisfactory to its miners. That there is an organization called the United Mine Workers of America, which has districts, and that Western Arkansas and Indian Territory constitute district No. 21 of said organization. That about the 23d or 24th day of February, Albert Struble, president, S. F. Brackney, secretary, and G. W. Britton and Daniel Bales, as an executive board, caused to be delivered to the plaintiff, through the hands of Thomas Sweeney, who was then the president of a local subdivision of said organization known as the United Mine Workers of America, the following proposed agreement:

"Article of agreement made and entered into this —— day of ——, 1899, between United Mine Workers of America, District 21, and the operators in the above-named district:

"Scale.

"(1) All coal shall be weighed before being screened, and two thousand pounds shall constitute a ton. (2) There shall be run of mine at 60 cents per ton for the Indian Territory, and 56 cents per ton, run of mine, for Arkansas, except the Russellville and Spadra districts. The Russellville district shall be 57½ cents per ton, run of mine, and for the Spadra district 60 cents per ton, run of mine; two thousand pounds to be a ton. And we further request that the maximum distance for pushing cars at Russellville, Denning, Spadra, Ouita, and Coal Hill shall be fifty yards. (3) That the question of yardage and dead work be left to individual locals for settlement by agreement or arbitration. (4) That the relative difference between pick miners and machine men remain the same, except that the loaders shall receive 30 cents per ton, run of mine. (5) Miners and mine laborers shall be paid every two weeks. (6) There shall be an uniform price of $1.75 per keg for powder. (7) Also an uniform price for

drivers of $2.25 per shift. (8) Also an uniform price for trappers of $1.00 per shift. (9) Further, that timbermen, track layers, cagers, rope riders, and slope switchmen shall receive not less than $2.25 per shift. (10) When the driver receives a car of coal, and after it leaves the miner's room, it is in charge of the company, and the company shall be responsible for it,—therefore the average weight be paid for broken cars; and, further, the company shall keep all cars in good shape, with full doors and ends. (11) Shot firers shall receive not less than $2.75 per shift. (12) The operators of this district of Arkansas and the Indian Territory shall not discriminate against the United Mine Workers of America. (13) The operators of this district shall grant the check-off system. (14) Dumpers shall receive not less than $1.80 per shift, and car trimmers and other top hands shall receive not less than $1.60 per shift.

"This scale shall be in operation from the 1st day of March, 1899, until the 31st day of August, 1899.

"We, the parties of the second part, composed of the mine operators known as ———, so hereby agree with the parties of the first part, composed of the United Mine Workers of America, of District 21, comprising Arkansas and the Indian Territory, to pay the prices and comply with the conditions named in the above scale formulated by the parties of the first part.

"Witness our hands this ——— day of ———, 1899.

"[Signed]

"————————————

"————————————

"————————————

"————————————

"————————————

Albert Struble, Pres.,
S. F. Brackney, Sect.,

Geo. W. Britton,
Daniel Bales,
"Executive Board."

That the said Thomas Sweeney, when he delivered said proposed agreement to plaintiff, notified it that, unless said agreement was signed, plaintiff's mines at Huntington would be closed down. That plaintiff did not sign the agreement, and on the 28th day of February, 1899, its miners at Huntington, with a few exceptions, did not return to work. That on the 1st of March, and every day thereafter, plaintiff had been ready, willing, and anxious to continue its business of mining coal, and to pay the miners fair and just wages for their labor, while in its employ. That the miners have been notified from time to time that they could return to work upon the prices for their services which they had been receiving before they quit, but, with a few exceptions, refrained from doing so. That about 59 continued to work after the 1st of March. That those who continued to work were threatened with violence, intimidated, coerced, abused, and vilified by those who quit work, and their condition was rendered so unpleasant and unsafe that, after working for a short period, most of them left the mines. That about 50 of that number had already left the mines, through intimidation, threats, and coercion. That only one or two of plaintiff's miners continued at work from the 1st of March, 1899, until the bill was filed. That, so far as plaintiff is informed, the wages paid by plaintiff to its miners prior to the 1st of March, 1899, were, in the main, satisfactory to them, and the miners working for it were receiving fair compensation for their labor. That their dissatisfaction was not caused by any act of the plaintiff, but was caused by the efforts of the leaders of the organization called the United Mine Workers of America. That said organization is attempting to form all the mine labor in Western Arkansas and the Indian Territory into a labor trust, pool, or combination. That its object and purpose are to obtain, not only the scale of wages set forth in the agreement hereinbefore set out, but to obtain control of the mine labor of the said territory, thereby preventing competition in labor, and preventing laborers exercising their right to work at such prices and upon such terms as they may be able to agree upon with their employers. That in pursuance of such purpose the members of said organization have used all means in their power to prevent any and all miners from working for the plaintiff upon any terms whatsoever, and their efforts have prevented the plaintiff from employing such miners as were necessary to carry on its business. That the plaintiff is engaged in a large coal business, has mining contracts for supplying coal, and, unless it can operate its mines, it will suffer great loss and damage by reason of the stoppage of its operations.

That the plaintiff has found it impossible to obtain sufficient miners in Western Arkansas and the Indian Territory to do its work in its mines at Huntington, on account of the threats, influence, persuasion, and other means employed by the United Mine Workers of America, District No. 21, and has been compelled to seek labor for its mines elsewhere. That the plaintiff was employing about four hundred miners prior to the 1st of March, 1899, and it requires about that number to properly work its mines to their full capacity. That owing to the action of said organization of said United Mine Workers of America since the 1st day of March, 1899, the plaintiff has been unable to secure but few miners, never exceeding at one time more than two hundred. That, finding it necessary to have miners to work its mines, plaintiff on the 20th day of April, 1899, employed about 20 miners, who came to Huntington from a distance, for the purpose of working its mines, and that it is the purpose and intention of the plaintiff to employ miners up to the full capacity of its mines, if the plaintiff is able to secure miners willing to work upon wages to be mutually agreed upon, and the plaintiff believes that if its employés are protected in their persons and in the pursuit of their lawful occupation, and the plaintiff in its property rights, it will have no difficulty in employing a sufficient number of miners, at wages to be mutually agreed upon. That, of the four hundred miners who were employed by the plaintiff prior to the 4th day of March, two hundred have left the said town of Huntington and gone to other points, two hundred remaining at said town. That a portion of those who remain are willing to return to the mines and work for the plaintiff upon the same terms upon which they had heretofore worked, but, by reason of the action of the United Mine Workers of America, they are not willing to leave said organization and return to their work, on account of intimidation, coercion, persuasion, and violence that would be offered them if they should see proper to return to their work contrary to the wishes of the organization. That a large portion of plaintiff's old employés remaining at Huntington are bitterly opposed to the plaintiff employing any other miners than themselves and other members of said organization, and denounce and resent the action of plaintiff in bringing in miners from other points to its mines. That the striking miners continue to make divers threats of harm towards those who see proper to seek employment from plaintiff. That a conspiracy exists among many and divers persons, principally members of the local union of the United Mine Workers of America at Huntington, to prevent plaintiff from employing miners who do not belong to said organization. That committees are appointed by said local union, who openly dissuade all persons seeking employment from accepting the same, to which course plaintiff has offered no objections, but they also secretly, and in divers ways, make it plain to any who might seek employment of plaintiff that dire calamities, injuries, and misfortunes will befall them, and bodily harm and injuries have been threatened and attempted upon those few miners who continue to work for plaintiff. That it is given out and made known, secretly, and mostly by innuendo and insinuation, that it will be extremely unsafe for any person to work for plaintiff under said circumstances. That the members of the local or Huntington union ostensibly decry and discountenance unlawful or violent methods, and claim that they exercise only moral suasion and fair argument to prevent persons from taking employment of the plaintiff; but, in some way to plaintiff unknown, they terrorize, intimidate, bulldoze, and otherwise improperly and unlawfully influence miners from accepting work. That plaintiff's employés have been attacked and brutally beaten (in one instance, shot at) while proceeding to work. In another instance the home of one was attacked, pistols drawn and thrust into his face, and he was told that, if he continued to work, he would be killed. That the employés of plaintiff told its superintendent that they were threatened by members of the organization, and, if they continued to work, their houses would be burned and their families assassinated. That in one instance the keeper of a boarding house was notified that she must refuse to board plaintiff's employés. That all of these things were done by members of the organization of United Mine Workers of America, as a part of a course of conduct to force plaintiff to accept the agreement hereinbefore set out, and to submit itself to their dictation, according to the terms of said agreement. That defendants have stated to numerous and divers parties that they would not permit plaintiff to operate its mines unless it

agreed to the terms of the agreement submitted to plaintiff on the 23d day of February, 1899. That said organization is conducting what is ordinarily called a "strike." That the defendants are all strikers, and that they and their confederates gather in noisy and turbulent groups in and about the town of Huntington, and about the property of the plaintiff, for the purpose of showing their force, and intimidate and terrorize those who would obtain employment. That it is the purpose of plaintiff to employ a large number of miners, whom it expects to reach said town of Huntington on Monday, the 24th of April. That, from all information the plaintiff can gather, it is led to believe that, unless this court will take some action in the premises to prevent it, such miners will be met and treated with violence, and that plaintiff's property will be subjected to violence, and plaintiff suffer serious loss and injury, and that, if it is unable to continue its business and operate its mines, its contracts and engagements will be broken, and it will suffer great and irreparable loss. That the plaintiff has applied to the sheriff of the county for protection of its property, and to its employés, but has been informed by the sheriff that he will not appoint deputies to guard its property, or guard the employés whom it seeks to put to work, asserting that any action upon his part looking to this end would precipitate riot and bloodshed between his deputies and the striking miners; and, moreover, the sheriff informs this plaintiff he has no authority under the law to appoint deputies to protect plaintiff's property, in the present state of affairs. Plaintiff is informed and believes that, unless this court restrains the acts herein complained of, its trade will be diverted and lost, its shipments of coal withheld, its obligations to the public and its customers left unfilled, and it will be deprived of the ability to perform its contracts with its customers, and that its business, built up by industry and large expenditures of capital, will be ruined, and it involved in a multiplicity of suits with the defendants and others. That the defendants are either wholly insolvent, or of such small means that it would have no remedy in damages against them whatsoever, and that the damages which would be sustained by the plaintiff are impossible to be estimated even approximately. That the amount involved in this suit far exceeds the sum of two thousand dollars. That all of the defendants are members of the local union of the United Mine Workers of America, and are influential in shaping the course of conduct hereinbefore outlined, and now being pursued by the striking miners. That many and divers other persons, to plaintiff unknown, have unlawfully conspired with the defendants to prevent plaintiff obtaining miners to operate its mines, and are using their strongest efforts to coerce the plaintiff into signing the agreement hereinbefore set forth.

The bill then describes the property owned by plaintiff, and where it is situated, and prays for a subpoena in chancery and for a restraining order.

At the hearing for the preliminary injunction, the witnesses were sworn in open court, and testified to facts sustaining substantially the material facts alleged in the bill, and their testimony was taken down by a stenographer.

The restraining order is as follows:·

"Whereas, in the above-entitled cause now pending in the United States court for the Western district of Arkansas, Ft. Smith division thereof, upon application duly made to the said court on the 22d day of April, 1899, it was ordered that a preliminary writ of injunction issue herein as prayed for in the bill of complaint herein filed, which said order, among other things, provided as follows: That you and each of you, and all other parties, be, and are hereby, enjoined and restrained from doing any and all of the following acts and deeds, to wit: First. From in any way or manner interfering with, hindering, obstructing, or stopping any of the business of the Kansas & Texas Coal Company, in, near, or about the town of Huntington, in the county of Sebastian and state of Arkansas, in the operation of its coal mines, or any other part of its business, in said town of Huntington, or elsewhere. Second. From entering upon the grounds and premises of the plaintiff, or congregating

thereon or thereabouts, for the purpose of interfering with, hindering, or obstructing the plaintiff in its business in any form or manner. Third. From compelling, inducing, or attempting to compel or induce, by threats, intimidation, unlawful persuasion, force, or violence, any of the employés of the Kansas & Texas Coal Company to refuse or fail to perform their duties as such employés. Fourth. From compelling or inducing, or attempting to compel or induce, by threats, intimidation, force, unlawful persuasion, or violence, any of the employés of the Kansas & Texas Coal Company to leave the service of the said company, and from preventing, or attempting to prevent, any person or persons, by intimidation, threats, force, unlawful persuasion, or violence, from entering the service of the Kansas & Texas Coal Company. Fifth. From doing any act whatever in furtherance of any conspiracy or combination to restrain or to hinder the Kansas & Texas Coal Company, its officers or employés, in the free and unhindered control of the business of the Kansas & Texas Coal Company. Sixth. From ordering and directing, aiding, assisting, abetting, or encouraging, in any manner whatever, any person or persons to commit any of the acts aforesaid. Seventh. From congregating at or near or on the premises or property of the Kansas & Texas Coal Company, in, about, or near the town of Huntington, Arkansas, or elsewhere, for the purpose of intimidating its employés, or coercing said employés, or preventing said employés from rendering services to the Kansas & Texas Coal Company. Eighth. From inducing or coercing, by threats, intimidation, force, or violence, any of the said employés to leave the employment of the Kansas & Texas Coal Company, and from in any manner interfering with said Kansas & Texas Coal Company in carrying on its business in its usual and ordinary way, and from in any manner interfering with or molesting any person or persons who may be employed or seek employment by and of the Kansas & Texas Coal Company in the operation of its coal mines at and near said town of Huntington or elsewhere. Ninth. From trespassing or going upon the grounds, premises, or property of the Kansas & Texas Coal Company, which are more particularly described hereinafter, and from gathering in and about any of said property in large numbers, or in company with each other, or other persons who are not herein named, for any of the purposes hereinbefore prohibited. The property sought to be protected herein consists, in part, as follows: Mine No. 51, about one and a half miles north of west of Huntington; mine No. 53, about one and a quarter miles from Huntington, in direction as aforesaid; mine No. 63, situated just outside of the town limits of said town; mine No. 65, two miles west of Huntington, on 'Frisco road; and mine No. 45, now abandoned, but with machinery still about it; and the top houses, tipples, engine houses, boiler houses, fan houses, air shafts, engines, boiler, tracks, pumps, ventilating fans, stables, mules, coal cars, mine timbers, blacksmith shops, powder magazines, company store and warehouses, and stocks of merchandise, tenement houses, and all other real and personal and mixed property, whether herein named and designated, or herein omitted, belonging to said mines, or belonging to or in the possession or control of the Kansas & Texas Coal Company; also, strip pits, leases, and various and divers other kinds and classes of property, too numerous to mention or specifically describe. And you, and each of you, are hereby commanded that you do desist and refrain from doing or causing to be done, or aiding or abetting in doing or causing to be done, any of the acts or things herein recited, or interfering or injuring, or attempting to interfere with or injure, any of the property herein mentioned, or any other property of the Kansas & Texas Coal Company, whether herein mentioned specifically or omitted. And you are hereby further notified that the matters and things required of the plaintiff by the court have been complied with, and that the marshal is instructed to serve this preliminary injunction upon you, and each of you, and any and all other parties that he receives information are about to do, or contemplate doing, any of the matters and things herein forbidden; and he is further ordered to give publicity to this injunction in and about the town of Huntington, and to warn the parties herein mentioned, and all others, of the purport of this order, and the penalties attending a violation thereof; the form of this injunction having been approved by the court.

"Witness the Honorable JOHN H. ROGERS, judge of said court, on this 22d day of April, 1899, and the seal of said court."

Subsequently; and while this restraining order was in full force, no steps having been taken to vacate or modify it, and no disturbances having occurred, on the night of the 15th of May the strikers made a simultaneous attack at three different points at Huntington where plaintiff company's mines are situated. One attack was upon a negro boarding house, not the property of the plaintiff, but in which were sleeping 12 or 15 negro miners in the employ of the plaintiff company; the strikers using dynamite, and blowing a hole through the porch, and blowing out one side of the house. At a con siderable distance therefrom, about the same time, they fired numerous shots through the residence of a white man with whom some of plaintiff's white employés boarded. Fortunately no casualties occurred at either of these places. About the same time an assault was made with guns on the company guards at the shaft of the mine, some distance from the places where the other assaults were made. One of the guards was wounded through the shoulder and head. Thereupon the guards returned the fire, and one of the strikers was killed. It is not known who the individuals were who engaged in these assaults. The man killed was a striker, and his comrades carried him away; leaving, however, at the spot where he was shot, a large quantity of dynamite and two revolvers. A searching investigation by the state authorities of this effort at midnight assassination failed to disclose any one who had any knowledge of it. From the circumstances, however, it must be assumed that the persons engaged in it were strikers. The reasonable conclusion is that they intended to drive away or kill the guards, and then dynamite the mine and the machinery used in its operation. It is proper to add that about half the men assaulted were not imported into this state (if that made any difference), but were in the employ of the company when the strike was called, and who, after the injunction was granted, had returned to work. The details of this lawless and felonious conduct were the next day, May 16th, communicated, both by wire and letter, by the presiding judge of this court, to the attorney general of the United States, and the request made for 40 special deputy marshals to enforce the injunctions granted by this court in that and other cases. An answer came, promptly, to swear in 40 special deputies, which was done; and about 15 of these deputies were located at Huntington, and the others distributed at other mines where injunctions were in force. Before they were sent out, this court, in open court, carefully advised them of their duties, and cautioned them against any violations of state laws, or of being inveigled into disputes and controversies with the strikers, and directed them to remain as close as possible to the company property, and to protect it and its employés from any interference by the strikers. This condition of things obtained, the company steadily filling its mines with miners from other states, both white and colored,—principally colored,—until July 3d, when the town marshal of Huntington, in the effort, without a warrant, to arrest a colored miner in the employ of the coal company who was accused of having on his person a concealed weapon in violation of the statutes of the state, was resisted, and an altercation occurred, in which the marshal came out second

best, and the miner and his companion, who assisted him, escaped and went to the mine, then guarded by deputy United States marshals. An affidavit was immediately filed in this court against the town marshal (himself a white striker) and two colored strikers, his posse, for contempt of this court, in violating the injunction by interfering with the employés of said plaintiff company; and a writ of habeas corpus was sued out for the negroes who had resisted arrest, but who in the meantime had been surrendered to the town authorities of Huntington for trial. Upon an investigation by this court it was of opinion that the negro miner was, at the time the marshal sought to make his arrest, carrying a concealed weapon; and hence the court remanded him and his confederate to the state authorities to answer for his crime, although he stoutly denied he had any weapon when the town marshal sought to arrest him. It also discharged the town marshal and his posse, with some misgivings as to its duty, since the evidence strongly impressed the court of gross misconduct upon the part of the marshal, and tended to show that in making the arrest he sought to oppress the accused because he was a company employé. On the following day (July 4th) the miners held a meeting, and adjourned to meet at 2 o'clock p. m. on July 5th. On July 5th, two days before the decree pro confesso was made final, at noon, the miners at adjoining mines (some of them having resumed work) laid off. Many did not go to work at all on July 5th. Early in that morning they and the strikers began to assemble at Huntington, and by 2 p. m. a large body of miners from Huntington, Jenny Lind, Prairie Creek, Bonanza, and Greenwood, variously estimated at from three to eight hundred men (a majority armed with shotguns, Winchester rifles, and pistols), assembled in the town of Huntington. During the day of July 4th the superintendent of the mines heard, in various ways, that the mine was to be assaulted at 2 o'clock p. m. on the 5th, and the miners killed or driven away. The same information came to him directly from the assembled strikers on the forenoon of July 5th. At noon he, out of abundant caution, and having due regard for his men, called the men out, frankly stated to them what he had heard, advised them of the assemblage of many armed men up in the town, informed them that, if they chose to stay, they could do so, and that he would give them all the protection in his power; that he intended to stay himself, but, if they chose to go, they were at liberty to do so. The negroes nearly all left, and started to town, to their homes and families. The deputy United States marshals and white miners, whom the superintendent also apprised of the situation, were offered the same opportunities, but stayed and awaited the attack. In the meantime, before the colored miners had left the mine to go to their homes, the strikers had gotten two of their number who were not at work on that day, and, having frightened them, sent them to their comrades at the mine, to tell them to come out, or they would be killed that evening. These two men met many of the miners on their way home, advised them of the situation, and urged them to go to the meeting of the strikers. They started, and, when met by the armed strikers, were escorted to the meeting under guard, and when there

they were corralled and kept under guard until 8 or 9 o'clock at night. Such of them as did not go to the meeting were arrested wherever found, and taken to the meeting, and, with their fellow miners, guarded. In the meantime, after nearly every colored man in the employ of the company had been arrested and put under guard, a squad of armed strikers went to the homes of the colored men, where their wives and children remained in terror, and searched their houses, turning up beds and going through trunks and boxes, and taking firearms of all kinds; not even sparing the homes of those whose families were sick and confined to their beds. While under guard the colored men were harangued by violent agitators, urging they be lynched, killed, or driven out of the state, and the like. About 7 or 8 o'clock, at the instance of the mayor of Huntington, who was absent from the city on that day, but returned late in the afternoon, the colored men were released, and went to their homes.

It is clear from the evidence that the meeting of July 5th was called on July 4th; that the avowed purpose was to attack mine No. 53 of the coal company, then protected by the injunction of this court, and guarded by deputy marshals appointed by the express authority of the attorney general for the purpose of enforcing that injunction, and protecting the company's property and employés from interference of any kind by the strikers. The purpose of this meeting, if carried out, involved a wanton and felonious assault upon the officers of this court while in the discharge of their duty. It involved a felonious attack upon the peaceful miners working at that mine. It involved the destruction of the company's property, and injury to persons covered by the injunction. That meeting was assembled partly on the property of the company, and guards and pickets stationed at various commanding and strategic points on the company property, and the colored men, in large numbers, were corralled and guarded in the machine shop yard of the company. The meeting was riotous and felonious. The meeting itself, there, was a clear, positive, and aggressive violation of the second, seventh, and ninth paragraphs of the injunction, which forbid any such meeting held at or near the company property. The avowed purpose of the meeting, while it was being held, made by numbers of its armed members, as testified to by various witnesses, and admitted under oath by one of these defendants, was to assault the mine of plaintiff company, and kill or drive out its employés. In the opinion of the court, one of two things is true: Either they intended to carry out their threat to attack, kill, or drive out the company's employés, or they intended, by a bold, audacious show of armed force, to "peaceably persuade," as they would have us believe now, but, in truth, to bulldoze and intimidate, the company's employés in the mines, until, for very fear, they would leave the mine and go where they could get to them, and, having obtained possession of them, search their houses, disarm them, and then to threaten, abuse, and harangue them into a state of fear; thereby forcing them to leave the employ of the company, and either join the strikers or leave the state. Such a meeting for either purpose at that place involved a clear, undisguised, and intentional violation of

almost every paragraph of the injunction; and the court is of opinion, further, that but for the foresight and prudence of the superintendent of the mine in calling the men out and giving them an opportunity to leave the mine, thereby enabling the striking miners to arrest a large majority of the men, in all probability a collision would have occurred on the evening of July 5th. This meeting did not originate in race hatred, or because the men at work were either of the criminal classes, or diseased, but because they had taken the places vacated by the strikers. It is true that many of the company employés, arrested and falsely imprisoned by this mob, now, doubtless by way of "benevolent assimilation," styled by them a "citizens' meeting," had been imported from other states since the strike begun, and they were colored men; but it is due the truth to say that those of them who appeared as witnesses were of a superior class, far above the average colored laborer in the South, and on the witness stand they deported themselves in such a way as to impress the court that they were trying to tell the truth. I have carefully read over the testimony since the trial, and I think no one can read it without reaching the conclusion that it is worthy of credence, although, from a sense of fear, some of them had done and said things at and before the meeting of July 5th somewhat out of harmony with their testimony (which was to be expected), and although, from excitement at the time, they may not have remembered all the circumstances as they occurred. The former residence of each colored witness, and the time he had been in the state, was ascertained. They came from Iowa, Illinois, Missouri, Kentucky, and Tennessee, and were miners, many of them having families; and, of the colored men in the mine, a considerable per cent. were born and raised in this county, and had been mining at that very place for years. Others, born in other states, had been mining there for several years. But there was also a considerable per cent. of white men at work. The testimony wholly failed to show any contagious disease among them, or that they had ever belonged to the criminal classes anywhere, or had participated in any strike, or ever been present where any strike was on. On the other hand, among the strikers were home-born negroes and negroes from other states. One of the former figured prominently at public meetings of the strikers, making incendiary speeches and stirring up strife. Others were less prominent in their meetings, but took active parts as agitators. So that there was no question of color line or of criminal classes or of contagious diseases involved. Of these 10 defendants, it is painfully true, but it should be stated, most of them are American born, and all, I believe, citizens of the United States. Most of them came from other states, and some are Arkansans.

An effort was made to show that the meeting of July 5th was composed largely of citizens from the surrounding country,—farmers of this county. In the opinion of the court, the testimony shows this to be absolutely without foundation. No witness has been able to name a single bona fide farmer, armed, at that meeting. Mr. Crump, a farmer living in that neighborhood, testified that he thought he knew almost every old settler in that district of the county; that he

had been deputy sheriff for several years, and had visited or knew almost every farmer in the county; that he 'passed by the meeting, was himself arrested by the mob, and guarded on a business errand by them, and that he did not see a single farmer armed that day. The people of this county have not resorted to mob violence but once in 25 years, and they do not share any part of the responsibility for the mob of July 5th, except as it may attach to the maladministration of the municipal government of Huntington, partly composed of, and altogether dominated by, the strikers, and the failure to enforce state laws at that place. It is due these defendants that they be made to know that they were guilty of false imprisonment, under the state law, every time they detained by force, arrested, or guarded a man on that day; that they are subject to indictment for robbery or larceny for each gun they took from the negro miners by force or stealth; that they are subject to indictment for criminal conspiracy at the common law; that they are subject to prosecution for assault and battery, for disturbing the peace, for riot, and for other misdemeanors, under state statutes; and that a number of them are subject to prosecution for perjury in this court. I consider it my duty, as a judge and as a citizen, that I should furnish the state circuit judge with a copy of the stenographic report of the testimony in this case, that he may, in the exercise of his high office, if he thinks it his duty, call the special attention of the grand jury to the violations of law at Huntington on July 5th. It must not be forgotten that the punishment of these defendants for violating the injunction of this court does not relieve them from answering to the state for the infraction of its laws.

It was upon the proceedings I have summarized that affidavits were filed in this cause against the defendants on trial, charging, in substance, that each of them had violated the injunction of this court on July 5, 1899, in that they were parties to a conspiracy, and participated in the riotous proceedings detailed, and for the object and purpose of removing, forcibly, if necessary, and by unlawful persuasion, intimidation, and coercion, if possible, the plaintiff's employés,—ostensibly because said employés were negroes, but really because the company was operating its mines without the aid of the strikers. These affidavits also state that said conspiracy was carried out in many ways, and specifically state several acts attributed to the several defendants.

The defendants filed separate answers, in which they admit the meeting without denying its character, but saying they do not know what the object and purpose of the meeting was, and that, if its purpose was as stated, they did not in any way participate therein. They deny violating the injunction, and any knowledge that it was violated. They deny the specific acts alleged against them. These answers are duly verified under the oath of the several defendants. That these answers are not only evasive and false, and they knew they were false, is abundantly established, and in some cases, to all intents and purposes, admitted by themselves to be false, when they came upon the stand to testify as witnesses. Take T. Lingo as an example. His answer was the same as the others, except that he

denied knowing the object and purpose of the meeting, and alleged that, if the purpose was as stated in the affidavit against him, he did not lend his aid or participate therein, and did not violate the injunction, and did not know that it had been violated, and states affirmatively that he met a crowd, and was by them forced and compelled to take a gun and go to the train; and when Grant and Tom Gentry, two of the company's colored employés, were arrested by the strikers, he was compelled to go with them to the meeting, against his will, and did not participate in the acts and doings of the crowd. The proof shows he not only arrested and guarded persons, and disarmed one colored man, and arrested him and his wife on the way to the train to leave town, but that he had a gun all day, and participated in the arrest of Grant and Tom Gentry at the train. Nobody acted any worse than he, except those who searched, and by force took from the families of the company employés, occupying houses owned by the company, their firearms. Take Sweeney. His answer was about as stated above, and yet the proof shows overwhelmingly that he was the controlling spirit of the whole riotous proceeding. He had been president of the local union. He was at the meeting early, with book and pencil, evidently forming committees, and directing their actions. To him persons arrested were brought to report, and were held or released, as he directed. He was armed at times, and at other times unarmed. Witnesses testify, and are not contradicted, that he directed searches to be made, and guns taken from the colored miners. He was, as the witnesses say, "boss"; and yet this man, young and intelligent, filed and swore to an answer the substance of which I have stated. It is but just to say that, with becoming discretion, after hearing the evidence, he did not venture to testify in his own defense. The testimony of these defendants without exception shows an effort to make some plausible, specious, but, as it turns out, absolutely incredible, excuse for their presence, with arms, at the meeting, and to explain away inculpating conduct that will not explain. Summed up, it presents a sickening, disgusting, palpably false, and utterly insufficient defense, at once both shameless and shameful. If this court should accept their testimony as true, it would at once forfeit the respect of all honest men, and become the object of ridicule and contempt by these defendants, and would rightly deserve to be regarded by them as its injunction has been treated by them,—with contempt, contumely, and defiance.

There is not a single question of law involved in all these proceedings not settled by authority as binding on this court as if written into the statutes of the United States. That the court had jurisdiction of the original bill for injunction there can be no doubt. Wire Co. v. Murray, 80 Fed. 811; Mackall v. Ratchford, 82 Fed. 41; U. S. v. Debs, 64 Fed. 724; In re Debs, 158 U. S. 573, 15 Sup. Ct. 900. There is no settled practice in contempt proceedings. The proceedings in this case conform to the practice elsewhere. But, if irregular, no question has been raised, no complaint urged, that the defendants did not have ample notice of the charge against them. For practice in contempt proceedings, see Fischer v. Hayes, 6 Fed. 76; U. S. v. Memphis & L. R. R. Co., Id. 237; U. S. v. Wayne, 28 Fed. Cas.

504. That parties cannot conclusively purge themselves of contempt by filing answers denying acts alleged against them, see U. S. v. Debs, 64 Fed. 725, and the cases there cited; In re Debs, 158 U. S. 594, 15 Sup. Ct. 900. That it was the duty of the court, on the facts alleged in the bill, to grant the injunction, is sustained by authority. Wire Co. v. Murray, 80 Fed. 811; Mackall v. Ratchford, 82 Fed. 41. That the court has the power, and that it is its duty, to punish a person violating its injunction, is a principle universally recognized, and as old as equity jurisprudence. Wire Co. v. Murray, 80 Fed. 811; In re Debs, 158 U. S. 595, 15 Sup. Ct. 900. "To render a party amenable to an injunction, it is not necessary that he should have been a party to the suit in which the injunction was issued, nor to have been actually served with a copy of it, so long as he appears to have had actual notice." Ex parte Lennon, 166 U. S. 549, 17 Sup. Ct. 658. The defendants were shown to have had actual notice, and none of them claimed a want of notice as a defense, or testified he did not have it. To claim that the exercise of the power to protect by injunction property and persons engaged in lawful business enterprises in proper cases, and where the remedy at law is inadequate, and the injury irreparable, is new, or that such proceeding is a modern invention of the federal courts, is as stupid as it is untrue. Wire Co. v. Murray, 80 Fed. 811. In the last case cited Judge Sage reviews the history of injunctions in a case in principle precisely on all fours with this one, and shows by numerous citations that the remedy by injunction came to us from the courts of England, and had been widely followed in this country by the courts of the several states. That case is instructive as showing that the first case in a dispute of this character occurred in England in 1868, and that there was ample authority for the injunction found in state decisions without citing a single federal case. That the remedy by injunction has become more common in modern or recent times is doubtless true, and grows out of the ever-changing conditions and evolutions in business incident to modern civilization. That the courts adapt themselves to these changing conditions, and afford relief, and preserve the personal and property rights of the individual citizen, is a tribute to the conservatism and wisdom of both bench and bar. There is nothing either strange, novel, or extraordinary about these proceedings. Suppose A., a citizen and resident of Missouri, should file his bill in this court against B. and his co-defendants, citizens and residents of Arkansas, alleging that he was the owner and seised in fee of a valuable tract of land, an addition to this city, covered by a heavy forest of great beauty and value; that he had employed hands, and was opening up and grading streets and alleys preparatory to placing the same on the market; that B. and his co-defendants, who were insolvent and irresponsible, but who, for reasons satisfactory to themselves, whether good or bad, had conspired together, and, in order to prevent the land being improved and put on the market, assembled from day to day, with force and arms, and drove away A.'s employés, and were cutting, despoiling, and hauling away his forest; that he had applied to the peace officers and local authorities, and they refused to protect his property, or to disperse the mob, or to protect his employés. Could

this court, with any conscience, refuse injunctive relief on the well-known grounds for equity jurisdiction, namely, inadequate remedy at law, irreparable mischief, and to avoid multiplicity of suits? To state the case is to answer it. Suppose the court granted the relief, and restrained B. and his co-conspirators from further trespassing and interfering with A.'s land and employés; suppose B. and his co-conspirators, after service of the injunction, continued their trespasses on A.'s land, and to drive off his employés, and, when cited to show cause why they should not be punished for contempt, should gravely answer, "Not guilty," and demand a jury. There you would have a court rendering a judgment and granting relief which it has no power to enforce, or the enforcement of which depends on the verdict of a jury. What is the difference in principle between that case and this? None whatever. Take another illustration: Suppose a wholesale house in this city should, for reasons satisfactory to its owners, pay off and discharge one of its employés, whereupon the others should all quit work, and walk out. Thus far no rights are invaded. The merchant has discharged one of them, as he had the legal right to do, and the other employés quit, as they had the legal right to do. But suppose all the employés step up, and say, "You must close up this house or restore this discharged employé, and increase the wages of us all twenty per cent.; and if you do not do it you cannot open this house, or sell these goods, and if you attempt to do it we will dynamite your house, and kill you." What is the difference between that case and the one at bar? And will courts of equity grant no relief in cases of this kind, where the employés are insolvent, and the injury to be inflicted irreparable? This is anarchy. If the striking miners have any such power as this, it must needs be all other citizens have the same power. Let us see. Suppose the plaintiff company ultimately succeeds in filling its mines with nonunion miners until they outnumber the strikers, and are better armed, and are equally as stubborn in the exercise of their rights, and are supported by the influence and sympathy of the local authorities.. Suppose at this juncture they advise the local union of mine workers at Huntington that they shall not work in plaintiff's mine until they abandon the union, or not work at all, although plaintiff company desires their services and seeks their employment? The exercise of such a power is no higher or greater than the strikers now strive to exercise. The assumption of such a power by a mere handful of men, as compared with the population of this great country, must needs proceed (if it exist at all) from a very high source. It invades the personal liberty of the citizen, sweeps away the guaranties of personal and property rights, which our fathers deemed so sacred that they incorporated them into the federal and state constitutions. Such an assumption of power and right must needs challenge investigation. Where do the strikers acquire it? If they have acquired it, from whence does it come? Who confided it to them? What is this association that it should assume to exercise a power not confided to the states, and in contravention of the federal constitution? Who shall point out the reasons why so great a power should be exercised exclusively by them? What peculiar qualities have they exhibited of superior in-

telligence, higher character, and greater sense of right and justice than other persons, which renders them peculiarly fitted for so grave a duty as the exercise of so great a power and the enjoyment of such exclusive rights? No such power as they assume to exercise resides anywhere in this country. In law, all are equal, and they, like all others, are amenable to public law, and enjoy no legal rights which others do not possess; and the effort by any body of men to exercise any such power is a criminal conspiracy that should meet with no favor among honest men and good citizens in a free country. Thomas v. Railway Co., 62 Fed. 817; Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542.

It is said, by way of palliation, that great excitement prevailed at Huntington on July 5th. There was no excitement there not created by the lawless conduct of these defendants and their confederates. They created the excitement, and then sought to make it a pretext for assembling a mob. It cannot be learned too soon nor too thoroughly by these defendants and their confederates and sympathizers, and all other persons who do not know it now, "that under this government of and by the people the means of redress of all wrongs are through the courts and at the ballot box, and that no wrong, real or fancied, carries with it the warrant to invite, as a means of redress, the co-operation of a mob, with its accompanying acts of violence." In re Debs, 158 U. S. 599, 15 Sup. Ct. 912.

The claim that persons who violate injunctions are entitled, under the constitution, to a trial by jury, is denied by authority absolutely binding upon this court. In Re Debs, 158 U. S. 599, 15 Sup. Ct. 910, the court, by Mr. Justice Brewer, all the judges concurring, said:

"Nor is there in this any invasion of the constitutional right of trial by jury. We fully agree with counsel that 'it matters not what form the attempt to deny constitutional right may take. It is vain and ineffectual, and must be so declared by the courts;' and we reaffirm the declaration made for the court by Mr. Justice Bradley in Boyd v. U. S., 116 U. S. 616, 635, 6 Sup. Ct. 535, that 'it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be "obsta principiis."' But the power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been from time immemorial the special function of the court. And this is no technical rule. In order that a court may compel obedience to its orders, it must have the right to inquire whether there has been any disobedience thereof. To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half of its efficiency. In the Case of Yates, 4 Johns. 314, 369, Chancellor Kent, then chief justice of the supreme court of the state of New York, said: 'In the Case of Earl of Shaftesbury, 2 State Tr. 615, 1 Mod. 144, who was imprisoned by the house of lords for "high contempts committed against it," and brought into the king's bench, the court held that they had no authority to judge of the contempt, and remanded the prisoner. The court in that case seem to have laid down a principle from which they never have departed, and which is essential to the due administration of justice. This principle that every court, at least of the superior kind, in which great confidence is placed, must be the sole judge, in the last resort, of contempts arising therein, is more explicitly defined and more emphatically enforced in the two subsequent cases of Reg. v. Paty [2 Ld. Raym. 1105] and of Crosby's Case [3 Wils. 188].' And again, on page 371: 'Mr. Justice Blackstone pursued the same train of observation, and declared that all courts—by which he meant to

include the two houses of parliament and the courts at Westminster Hall—could have no control in matters of contempt; that the sole adjudication of contempts, and the punishments thereof, belonged exclusively, and without interference, to each respective court.' In Watson v. Williams, 36 Miss. 331, 341, it was said: 'The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and co-existing with them by the wise provisions of the common law. A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it.' In Cartwright's Case, 114 Mass. 231, 238, we find this language: 'The summary power to commit and punish for contempts tending to obstruct or degrade the administration of justice is inherent in courts of chancery and other superior courts as essential to the execution of their powers and to the maintenance of their authority, and is part of the law of the land, within the meaning of Magna Charta and of the twelfth article of our Declaration of Rights.' See, also, U. S. v. Hudson, 7 Cranch, 32; Anderson v. Dunn, 6 Wheat. 204; Ex parte Robinson, 19 Wall. 505; Mugler v. Kansas, 123 U. S. 623, 672, 8 Sup. Ct. 273; Ex parte Terry, 128 U. S. 289, 9 Sup. Ct. 77; Eilenbecker v. District Court, 134 U. S. 31, 36, 10 Sup. Ct. 426,—in which Mr. Justice Miller observed: 'If it has ever been understood that proceedings according to the common law for contempt of court have been subject to the right of trial by jury, we have been unable to find any instance of it.' Commission v. Brimson, 154 U. S. 447, 488, 14 Sup. Ct. 1138. In this last case it was said: 'Surely, it cannot be supposed that the question of contempt of the authority of a court of the United States committed by a disobedience of its orders is triable, of right, by a jury.' In brief, a court enforcing obedience to its orders by proceedings for contempt is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to."

That case was argued by as great lawyers as are in this country, and was decided by the greatest court in the world. Until it is overturned, it must be held to be the law of the land. These defendants must be made to know that the very rights they strive to take away from others—the right to work, the right to make their own contracts, the right to follow any lawful occupation at any place in this country, the right to life, liberty, and the pursuit of happiness—are all preserved for them and all others by public law, administered always by courts organized for that purpose. These rights I have mentioned are inalienable rights, belonging to every citizen of the United States, guarantied by their constitution. That same great court, speaking by the late Mr. Justice Field, in Butchers' Union Slaughter-House Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 757, 4 Sup. Ct. 660, said:

"Among these inalienable rights as proclaimed in that great document [the Declaration of Independence] is the right of men to pursue their happiness, by which is meant the right to pursue any lawful business or vocation in any manner not inconsistent with the equal rights of others, which may increase their property, or develop their faculties, so as to give them their highest enjoyment."

And in Allgeyer v. Louisiana, 165 U. S. 589, 17 Sup. Ct. 431, the supreme court of the United States, through Mr. Justice Peckham, said:

"The liberty mentioned in that amendment [the fourteenth] means not only the right of the citizen to be free from the mere physical restraints of his person,—as by incarceration,—but the term is deemed to embrace the right of the

citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will, and earn his livelihood by any lawful manner; to pursue any livelihood or avocation; and for that purpose to enter into all contracts that may be proper, necessary, and essential to his carrying out the purposes above mentioned."

Much has been said about the men being employed by the plaintiff company being ex-convicts from other states. It might be answered that, but for the conduct of the defendants and their confederates, the company might have been able to have secured a superior class of men. But there is no evidence that they are ex-convicts. It is a mere subterfuge. But assume they are. They are still citizens of the United States, protected by its laws, and not denied the poor privilege of working for their daily bread; and because a man is an ex-convict is no reason why he should be mobbed. Moreover, it is no part of the duty of the United Mine Workers of America to determine what rights they possess or what rights they may have lost. That belongs to the courts.

I have referred to the many aspects of this case, and at greater length than was necessary, because I desire that these defendants shall understand fully the situation in which they have placed themselves, and in order that they may in future abstain from a repetition thereof.

There is one other proposition which I desire to notice, namely, that where a party of men combine with the intent to do an unlawful thing, and in the prosecution of the unlawful intent one of the party goes a step beyond the balance of the party, and does acts which the balance do not themselves perform, all are responsible for what the one does. In other words, in the pursuit by various parties of an unlawful conspiracy, each is responsible for the acts and doings of the others. U. S. v. Kane, 23 Fed. 751. There can be no doubt, in view of the testimony, that the meeting of July 5th was preconcerted, and held for a definite and fixed purpose. I have fully adverted to that. Nor is there any doubt that each one of these defendants attended that meeting in pursuance of the purpose for which it was called, and each participated in its acts and doings, one in one way and another in another, so that, in law, they are all equally culpable. To illustrate:

"Suppose three or four men form a purpose to commit burglary, and break into a house for the purpose of committing that burglary. That is all they intend to do. That is the unlawful act, and the single unlawful act, which they set out to accomplish. They get into the house. Somebody wakes up, and one of the party shoots and kills. Now, the three or four persons who went into that house never formed beforehand an intent to kill anybody. They simply went in there to commit burglary. But, combining to do that unlawful thing, in the prosecution of that burglary, and to make it successful, one of the party shoots and kills, and the law comes in, and says: 'All of you are guilty of murder. We do not discriminate between you. You broke into that house to commit burglary. In the prosecution of that burglarious entrance one of your party committed murder. All are guilty.' Now, that is a reasonable rule, when you stop to think of it. It is not a mere harsh, arbitrary, technical rule which the courts have laid down, and the statutes have established; it is a rule intended to prevent combinations or conspiracies to do an unlawful thing; and where there are many together it is often difficult to distinguish the one who does any particular act." U. S. v. Kane, 23 Fed. 751, 752.

There is one aspect of this case which, so far as I have discovered in a wide range of examination of cases, is peculiar to itself. No case has been found where strikers conspired and combined together and armed themselves with deadly weapons to openly and deliberately attack the officers of the United States in the discharge of their duties. Such was the avowed purpose here, as shown by their threats to attack mine No. 53, guarded by deputy marshals, and the searching of the Ft. Smith train for marshals when it arrived at Huntington on the evening of July 5th. This fact must not be overlooked in the punishment to be imposed. Mobs are becoming alarmingly frequent in some sections,—usually where the courts fail to enforce expeditiously and firmly the law; and criminals accordingly go unwhipped of justice. Sometimes they assemble upon a very slight provocation, but it cannot be truthfully said there was any predicate for the mob of July 5th. It was simply organized to break, not to vindicate the law already broken, if it be permissible to use that term at all in connection with the doings of a mob. It will be fortunate if the wide publicity of this case shall awaken a sense of responsibility and duty among good citizens as to the necessity of the rigid enforcement of public law, and the dangers to be apprehended if we cease to rely, even in moments of great excitement, upon the courts and other constituted authorities, for the preservation of all our rights.

Now, with these observations, let me proceed to deal with these defendants separately, making such distinctions as to their conduct as the testimony will warrant. The testimony in this case shows that the injunction was violated by some of these parties by visiting the houses of the company employés, and searching and taking from them such firearms as they found. Of this number are the defendants Heffley, Barrick, and Ed Hughes. And the proof is conclusive that the defendant Sweeney advised and counseled this to be done. Each of these same parties was also armed, and all of them assisted and aided either in arresting or guarding the men after they were corralled at the strikers' meeting. Defendant Sweeney was the most prominent leader, so far as the testimony has developed, at that meeting. I have already referred to the character of services he performed. Among others, it is quite clear that he posted the guards; that he caused these men to be arrested, and corralled, and guarded; that he caused these houses to be searched; that he formed committees, and assigned them their duties, and the like. He had been the president of this union. Presumably, his influence was as great, if not greater, than any other person at that meeting. While they are all equally culpable with him in violating the injunction, he is of especial prominence and influence, and therefore should be punished more severely than the others. I have concluded to impose upon him the punishment of imprisonment in the United States jail at Ft. Smith, Arkansas, for the period of 10 months; and the others—Heffley, Barrick, and Ed Hughes—the court orders imprisoned in the same jail for the period of 8 months. When these parties were found guilty, the court notified them then that they would have an opportunity to restore to the company's miners the

guns which had been taken from them in violation of the injunction. Up to the present time the court is not advised that any effort has been made to do so, or that a single gun has been returned. In other words, these defendants who engaged in that business apparently adhere to and justify what they have done, and I have made their punishment severer than I otherwise would have done, had they complied with the suggestion of the court, and repaired the injury they had committed. The defendants Will Welchell, Lingo, Bunch, Tallemene, and Morgan Morton were all guilty of arresting the employés of the company, and assisting in the guarding of them; and Bunch, especially, was violent, aggressive, and incendiary in his efforts to inflict harm or punishment upon the plaintiff's colored employés. The court will therefore inflict upon Bunch imprisonment in the said jail for the period of eight months, and upon Will Welchell, Tallemene, and Morton each imprisonment for the period of six months. There is less testimony against the defendant Kell than against any other one of these defendants. He may have been equally culpable, but, so far as the proof shows, his acts were less criminal. The court therefore inflicts upon him imprisonment in the said jail for the period of five months.

The duty I have discharged is a painful one. As said by Mr. Justice Brewer in U. S. v. Kane:

"Courts are organized for the protection of persons and property, and while, in the discharge of their duties, there are oftentimes unpleasant burdens cast upon them, yet no man is fit to occupy a position as a judge, especially in a court which, like this, has such vast powers and such solemn responsibilities, who can hesitate, whenever a wrong is brought to his attention, to treat it as a wrong, and punish accordingly."

This I have done, in the hope that it will be a lesson to these defendants and all other persons.